# McDONALD ET AL. v. SANTA FE TRAIL TRANS- PORTATION CO. ET AL.

No. 75–260.   Argued April 20, 1976—Decided June 25, 1976

274

Marshall, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, Blackmun, Powell, and Stevens, JJ., joined, and in Parts I and II of which White and Rehnquist, JJ., joined. White and Rehnquist, JJ., filed a separate statement, *post*, p. 296.

*Henry M. Rosenblum* argued the cause and filed a brief for petitioners.

*C. George Niebank, Jr.,* argued the cause for respondent Santa Fe Trail Transportation Co. With him on the brief was *Benjamin R. Powel. Chris Dixie* argued the cause and filed a brief for respondent Local No. 988 of

the Teamsters Freight, Tank Line & Automobile Industry Employees.

*Assistant Attorney General Pottinger* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Bork* and *Walter W. Barnett.**

MR. JUSTICE MARSHALL delivered the opinion of the Court.

Petitioners, L. N. McDonald and Raymond L. Laird, brought this action in the United States District Court for the Southern District of Texas seeking relief against Santa Fe Trail Transportation Co. (Santa Fe) and International Brotherhood of Teamsters Local 988 (Local 988), which represented Santa Fe's Houston employees, for alleged violations of the Civil Rights Act of 1866, 42 U. S. C. § 1981, and of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.,* in connection with their discharge from Santa Fe's employment. The District Court dismissed the complaint on the pleadings. The Court of Appeals for the Fifth Circuit affirmed. In determining whether the decisions of these courts were correct, we must decide, first, whether a complaint alleging that white employees charged with misappropriating property from their employer were dismissed from employment, while a black employee similarly charged was

---

*Briefs of *amici curiae* urging reversal were filed by *Samuel Rabinove* for the American Jewish Committee; and by *Gerard C. Smetana, Jerry Kronenberg, Lawrence B. Kraus,* and *Richard B. Berman* for the Chamber of Commerce of the United States.

Briefs of *amici curiae* were filed by *Larry M. Lavinsky, Arnold Forster, Amos Alter,* and *Donald A. Derfner* for the Anti-Defamation League of B'nai B'rith; and by *Jack Greenberg, Barry L. Goldstein,* and *Eric Schnapper* for the N. A. A. C. P. Legal Defense and Educational Fund, Inc.

not dismissed, states a claim under Title VII. Second, we must decide whether § 1981, which provides that "[a]ll persons . . . shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens . . ." affords protection from racial discrimination in private employment to white persons as well as nonwhites.

I

Because the District Court dismissed this case on the pleadings, we take as true the material facts alleged in petitioners' complaint. *Hospital Bldg. Co.* v. *Trustees of Rex Hospital,* 425 U. S. 738, 740 (1976). On September 26, 1970, petitioners, both white, and Charles Jackson, a Negro employee of Santa Fe, were jointly and severally charged with misappropriating 60 one-gallon cans of antifreeze which was part of a shipment Santa Fe was carrying for one of its customers. Six days later, petitioners were fired by Santa Fe, while Jackson was retained. A grievance was promptly filed with Local 988, pursuant to the collective-bargaining agreement between the two respondents, but grievance proceedings secured no relief. The following April, complaints were filed with the Equal Employment Opportunity Commission (EEOC) charging that Santa Fe had discriminated against both petitioners on the basis of their race in firing them, and that Local 988 had discriminated against McDonald on the basis of his race in failing properly to represent his interests in the grievance proceedings, all in violation of Title VII of the Civil Rights Act of 1964. Agency process proved equally unavailing for petitioners, however, and the EEOC notified them in July 1971 of their right under the Act to initiate a civil action in district court within 30 days. This suit followed, petitioners joining their § 1981 claim to their Title VII allegations.

Respondents moved to dismiss the complaint, and in June 1974 the District Court issued a final modified opinion and order dismissing petitioners' claims under both Title VII and § 1981. Turning first to the § 1981 claim, the District Court determined that § 1981 is wholly inapplicable to racial discrimination against white persons, and dismissed the claim for want of jurisdiction. Turning then to petitioners' claims under Title VII, the District Court concluded it had no jurisdiction over Laird's Title VII claim against Local 988, because Laird had not filed any charge against Local 988 with the EEOC.[1] Respondent Santa Fe additionally contended that petitioners' EEOC charges against it, filed more than 90 days after their discharge, were untimely.[2] Apparently relying upon Fifth Circuit authority for the proposition that the 90-day period for filing with the EEOC was tolled during the pendency of grievance pro-

---

[1] See § 706 (e) of the Act, 42 U. S. C. § 2000e–5 (e), as amended, 42 U. S. C. § 2000e–5 (f) (1) (1970 ed., Supp. IV). This issue is not presented for review on certiorari here.

[2] Sections 706 (a) and (d) of the 1964 Act provided in pertinent part:

"(a) Whenever it is charged in writing under oath by a person claiming to be aggrieved, . . . that an employer, employment agency, or labor organization has engaged in an unlawful employment practice, the Commission shall furnish such employer, employment agency, or labor organization . . . with a copy of such charge and shall make an investigation of such charge . . . . If the Commission shall determine, after such investigation, that there is reasonable cause to believe that the charge is true, the Commission shall endeavor to eliminate any such alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion. . . .

.        .        .        .        .

"(d) A charge under subsection (a) shall be filed within ninety days after the alleged unlawful employment practice occurred . . . ." Amendments to § 706 by § 4 (a) of the Equal Employment Opportunity Act of 1972, 86 Stat. 104, 42 U. S. C. § 2000e–5 (1970 ed., Supp. IV), are not pertinent to this case.

ceedings, however,[3] the District Court concluded that the question of timely filing with the EEOC could not be determined without a hearing on petitioners' allegations that they had not been notified until April 3, 1971, of the termination of the grievance proceedings.[4] But the District Court found it unnecessary to hold such a hearing, since it concluded, quite apart from any timeliness problem, that "the dismissal of white employees charged with misappropriating company property while not dismissing a similarly charged Negro employee does not raise a claim upon which Title VII relief may be granted." App. 117.

The Court of Appeals affirmed the dismissal, *per curiam,* 513 F. 2d 90 (1975), noting in regard to the Title VII claim asserted: "There is no allegation that the plaintiffs were falsely charged. Disciplinary action for offenses not constituting crimes is not involved in this case." *Id.,* at 90–91. We granted certiorari. 423 U. S. 923 (1975). We reverse.

## II

Title VII of the Civil Rights Act of 1964 prohibits the discharge of "any individual" because of "such individual's race," § 703 (a)(1), 42 U. S. C. § 2000e–2 (a)(1).[5] Its terms are not limited to discrimination

---

[3] See *Hutchings* v. *United States Industries, Inc.,* 428 F. 2d 303 (1970); *Culpepper* v. *Reynolds Metals Co.,* 421 F. 2d 888 (1970).

[4] Respondents also alleged that the grievance proceedings under the collective-bargaining agreement were concluded in October 1970, so that even asuming the 90-day period for filing with the EEOC was tolled until that time, the April 1971 charges were untimely.

[5] Section 703 of the Act, 42 U. S. C. § 2000e–2, provides in pertinent part:

"(a) *Employer practices.* It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges

against members of any particular race. Thus, although we were not there confronted with racial discrimination against whites, we described the Act in *Griggs* v. *Duke Power Co.*, 401 U. S. 424, 431 (1971), as prohibiting "[d]iscriminatory preference for *any* [racial] group, *minority* or *majority*" (emphasis added).[6] Similarly the EEOC, whose interpretations are entitled to great deference, *id.*, at 433–434, has consistently interpreted Title VII to proscribe racial discrimination in private employment against whites on the same terms as racial discrimination against nonwhites, holding that to proceed otherwise would

"constitute a derogation of the Commission's Con-

---

of employment, because of such individual's race, color, religion, sex, or national origin.

.      .      .      .      .

"(c) *Labor organization practices.* It shall be an unlawful employment practice for a labor organization . . . to cause or attempt to cause an employer to discriminate against an individual in violation of this section."

[6] Our discussion in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792, 802 (1973), of the means by which a Title VII litigant might make out a prima facie case of racial discrimination is not contrary. There we said that a complainant could establish a prima facie case by showing:

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." (Footnote omitted.)

As we particularly noted, however, this "specification . . . of the prima facie proof required . . . is not necessarily applicable in every respect to differing factual situations." *Id.,* at 802 n. 13. Requirement (i) of this sample pattern of proof was set out only to demonstrate how the racial character of the discrimination could be established in the most common sort of case, and not as an indication of any substantive limitation of Title VII's prohibition of racial discrimination.

gressional mandate to eliminate all practices which
operate to disadvantage the employment opportu-
nities of any group protected by Title VII, includ-
ing Caucasians." EEOC Decision No. 74–31, 7 FEP
1326, 1328, CCH EEOC Decisions ¶ 6404, p. 4084
(1973).[7]

This conclusion is in accord with uncontradicted legisla-
tive history to the effect that Title VII was intended to
"cover white men and white women and all Ameri-
cans," 110 Cong. Rec. 2578 (1964) (remarks of Rep.
Celler), and create an "obligation not to discriminate
against whites," *id.,* at 7218 (memorandum of Sen.
Clark). See also *id.,* at 7213 (memorandum of Sens.
Clark and Case); *id.,* at 8912 (remarks of Sen. Williams).
We therefore hold today that Title VII prohibits racial
discrimination against the white petitioners in this case
upon the same standards as would be applicable were
they Negroes and Jackson white.[8]

---

[7] See, *e. g.,* EEOC Decision No. 75–268, 10 FEP 1502, CCH EEOC
Decisions ¶ 6452 (1975); EEOC Decision No. 74–106, 10 FEP 269,
CCH EEOC Decisions ¶ 6427 (1974); EEOC Decision No. 74–95,
8 FEP 701, CCH EEOC Decisions ¶ 6432 (1974). None of the
Courts of Appeals appears directly to have confronted the question.
But compare, *Parks* v. *Brennan,* 389 F. Supp. 790 (ND Ga. 1974),
rev'd on other grounds *sub nom. Parks* v. *Dunlop,* 517 F. 2d 785
(CA5 1975), with *Haber* v. *Klassen,* 10 FEP 1446 (ND Ohio 1975);
*Mele* v. *United States Dept. of Justice,* 395 F. Supp. 592 (1975).
Neither of the opinions below articulated a clear stance on the issue.
Since his decision below, the District Judge in this case has held that
Title VII is applicable to white persons. *Spiess* v. *C. Itoh & Co.
(America), Inc.,* 408 F. Supp. 916, 918 n. 3, 929 n. 19 (SD Tex. 1976).

[8] Local 988 explicitly concedes that it makes no difference that
petitioners are white and Jackson Negro, rather than the other way
around. Brief for Respondent Local 988, p. 7. Santa Fe, while con-
ceding that "across-the-board discrimination in favor of minorities
could never be condoned consistent with Title VII," contends never-
theless that "such discrimination . . . in isolated cases which cannot
reasonably be said to burden whites as a class unduly," such as is

Respondents contend that, even though generally applicable to white persons, Title VII affords petitioners no protection in this case, because their dismissal was based upon their commission of a serious criminal offense against their employer. We think this argument is foreclosed by our decision in *McDonnell Douglas Corp.* v. *Green,* 411 U. S. 792 (1973).[9]

In *McDonnell Douglas,* a laid-off employee took part in an illegal "stall-in" designed to block traffic into his former employer's plant, and was arrested, convicted, and fined for obstructing traffic. At a later date, the former employee applied for an open position with the company, for which he was apparently otherwise qualified, but the employer turned down the application, assertedly because of the former employee's illegal activities against it. Charging that he was denied re-employment because he was a Negro, a claim the company denied, the former employee sued under Title VII. Reviewing the case on certiorari, we concluded that the rejected employee had adequately stated a claim under

---

alleged here, "may be acceptable." Brief for Respondent Santa Fe 20 (emphasis omitted). We cannot agree. There is no exception in the terms of the Act for isolated cases; on the contrary, "Title VII tolerates *no* racial discrimination, subtle or otherwise." *McDonnell Douglas Corp.* v. *Green, supra,* at 801 (emphasis added).

Santa Fe disclaims that the actions challenged here were any part of an affirmative action program, see Brief for Respondent Santa Fe 19 n. 5, and we emphasize that we do not consider here the permissibility of such a program, whether judicially required or otherwise prompted. Cf. Brief for United States as *Amicus Curiae* 7 n. 5.

[9] Both the District Court, App. 117, and the Court of Appeals, 513 F. 2d, at 90, specifically relied upon petitioners' failure to allege that the charge of misappropriating the antifreeze was false. Petitioners assert here that their complaint should be construed to deny culpability, Brief for Petitioners 18–19, n. 37, but for the reasons discussed in the text, we need not consider whether the complaint can so be read.

Title VII. See *id.*, at 801. Although agreeing with the employer that "[n]othing in Title VII compels an employer to absolve and rehire one who has engaged in such deliberate, unlawful activity against it," *id.*, at 803, we also recognized:

> "[T]he inquiry must not end here. While Title VII does not, without more, compel rehiring of [the former employee], neither does it permit [the employer] to use [the former employee's] conduct as a pretext for the sort of discrimination prohibited by [the Act]. On remand, [the former employee] must . . . be afforded a fair opportunity to show that [the employer's] stated reason for [the former employee's] rejection was in fact pretext. Especially relevant to such a showing would be evidence that white employees involved in acts against [the employer] of comparable seriousness to the 'stall-in' were nevertheless retained or rehired. [The employer] may justifiably refuse to rehire one who was engaged in unlawful, disruptive acts against it, but only if this criterion is applied alike to members of all races." *Id.*, at 804.[10]

We find this case indistinguishable from *McDonnell Douglas*. Fairly read, the complaint asserted that petitioners were discharged for their alleged participation in a misappropriation of cargo entrusted to Santa Fe, but that a fellow employee, likewise implicated, was not so disciplined, and that the reason for the discrepancy in

---

[10] The use of the term "pretext" in this context does not mean, of course, that the Title VII plaintiff must show that he would have in any event been rejected or discharged solely on the basis of his race, without regard to the alleged deficiencies; as the closing sentence to the quoted passage makes clear, no more is required to be shown than that race was a "but for" cause. See also *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 425 (1975).

discipline was that the favored employee is Negro while petitioners are white. See *Conley* v. *Gibson,* 355 U. S. 41, 45–46 (1957)[11] While Santa Fe may decide that participation in a theft of cargo may render an employee unqualified for employment, this criterion must be "applied, alike to members of all races," and Title VII is violated if, as petitioners alleged, it was not.

We cannot accept respondents' argument that the principles of *McDonnell Douglas* are inapplicable where the discharge was based, as petitioners' complaint admitted, on participation in serious misconduct or crime[12] directed against the employer. The Act prohibits *all* racial discrimination in employment, without exception for any group of particular employees, and while crime or other misconduct may be a legitimate basis for discharge, it is hardly one for racial discrimination. Indeed,

---

[11] Santa Fe contends that petitioners were required to plead with "particularity" the degree of similarity between their culpability in the alleged theft and the involvement of the favored coemployee, Jackson. This assertion, apparently not made below, too narrowly constricts the role of the pleadings. Significantly, respondents themselves declined to plead any dissimilarities in the alleged misconduct of Jackson and petitioners, and did not amend their pleadings even after an interim order of the District Court indicated it regarded petitioners' allegations of racial discrimination as sufficient to raise the legal problem of dissimilar employment discipline of "equally guilty" employees of different races. App. 94. Of course, precise equivalence in culpability between employees is not the ultimate question: as we indicated in *McDonnell Douglas,* an allegation that other "employees involved in acts against [the employer] of *comparable seriousness* . . . were nevertheless retained . . ." is adequate to plead an inferential case that the employer's reliance on his discharged employee's misconduct as grounds for terminating him was merely a pretext. 411 U. S., at 804 (emphasis added).

[12] Local 988 asserts petitioners' alleged misappropriations would amount to a felony under Texas law, Tex. Penal Code Ann. § 31.03 (1974), and federal law, 18 U. S. C. § 659. We assume this assertion to be true.

the Title VII plaintiff in *McDonnell Douglas* had been convicted for a nontrivial[13] offense against his former employer. It may be that theft of property entrusted to an employer for carriage is a more compelling basis for discharge than obstruction of an employer's traffic arteries, but this does not diminish the illogic in retaining guilty employees of one color while discharging those of another color.[14]

At this stage of the litigation the claim against Local 988 must go with the claim against Santa Fe, for in substance the complaint alleges that the union shirked its duty properly to represent McDonald, and instead "acquiesced and/or joined in" Santa Fe's alleged racial discrimination against him. Local 988 argues that as a matter of law it should not be subject to liability under Title VII in a situation, such as this, where some but not all culpable employees are ultimately discharged on account of joint misconduct, because in representing all the affected employees in their relations with the em-

---

[13] As we observed in *McDonnell Douglas*:

"The trial judge noted that no personal injury or property damage resulted from the 'stall-in' due 'solely to the fact that law enforcement officials had obtained notice in advance of plaintiff's . . . demonstration and were at the scene to remove plaintiff's car from the highway.' 318 F. Supp. 846, 851." 411 U. S., at 803 n. 16.

[14] Local 988's reliance on *NLRB* v. *Fansteel Metallurgical Corp.*, 306 U. S. 240 (1939), is misplaced. In that case we held only that it did not violate the National Labor Relations Act for an employer, after lawfully discharging a number of employees for their participation in an illegal sit-down strike, to extend re-employment to some, but not all, of those discharged employees. We held there that the employer "was simply exercising its normal right to select its employees." *Id.*, at 259. There was no suggestion of racial discrimination, or any discrimination based upon legally protected labor activities, in *Fansteel*, however. See also *American Ship Bldg.* v. *NLRB*, 380 U. S. 300, 312 (1965).

ployer, the union may necessarily have to compromise by securing retention of only some. We reject the argument. The same reasons which prohibit an employer from discriminating on the basis of race among the culpable employees apply equally to the union; and whatever factors the mechanisms of compromise may legitimately take into account in mitigating discipline of some employees, under Title VII race may not be among them.

Thus, we conclude that the District Court erred in dismissing both petitioners' Title VII claims against Santa Fe, and petitioner McDonald's Title VII claim against Local 988.

## III

Title 42 U. S. C. § 1981 provides in pertinent part: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." [15] We have previously held, where discrimination against Negroes was in question, that § 1981 affords a federal remedy against discrimination in private employment on the basis of race, and respondents do not contend otherwise. *Johnson* v. *Railway Express Agency,* 421 U. S. 454, 459–460 (1975). See also *Runyon* v. *McCrary, ante,* at 168; *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409 (1968). The question here is

---

[15] The statute provides in full:

"All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

whether § 1981 prohibits racial discrimination in private employment against whites as well as nonwhites.[16]

While neither of the courts below elaborated its reasons for not applying § 1981 to racial discrimination against white persons, respondents suggest two lines of argument to support that judgment. First, they argue that by operation of the phrase "as is enjoyed by white citizens," § 1981 unambiguously limits itself to the protection of nonwhite persons against racial discrimination. Second, they contend that such a reading is consistent with the legislative history of the provision, which derives its operative language from § 1 of the Civil Rights Act of 1866, Act of Apr. 9, 1866, c. 31, § 1, 14 Stat. 27. See *Runyon* v. *McCrary, ante,* at 168–170, n. 8; *Tillman* v. *Wheaton-Haven Recreation Assn.,* 410 U. S. 431, 439 (1973). The 1866 statute, they assert, was concerned predominantly with assuring specified civil rights to the former Negro slaves freed by virtue of the Thirteenth Amendment, and not at all with protecting the corresponding civil rights of white persons.

We find neither argument persuasive. Rather, our examination of the language and history of § 1981 con-

---

[16] The lower federal courts have divided on the applicability of § 1981 to racial discrimination against white persons. Decisions in accord with the holdings below include *Balc* v. *United Steelworkers,* 6 EPD ¶ 8948 (WD Pa. 1973); *Ripp* v. *Dobbs Houses, Inc.,* 366 F. Supp. 205 (ND Ala. 1973); *Perkins* v. *Banster,* 190 F. Supp. 98 (Md. 1960). Decisions in conflict include *Carter* v. *Gallagher,* 452 F. 2d 315, 325 (CA8 1971); *Hollander* v. *Sears, Roebuck & Co.,* 392 F. Supp. 90 (Conn. 1975); *WRMA Broadcasting Co., Inc.* v. *Hawthorne,* 365 F. Supp. 577 (MD Ala. 1973); *Gannon* v. *Action,* 303 F. Supp. 1240, 1244–1245 (ED Mo. 1969), aff'd on other grounds, 450 F. 2d 1227 (CA8 1971); *Central Presbyterian Church* v. *Black Liberation Front,* 303 F. Supp. 894, 901 (ED Mo. 1969). We note that the District Judge in this case has changed his view since the decision below, and held that § 1981 is applicable to white persons. *Spiess* v. *C. Itoh & Co. (America), Inc.* 408 F. Supp. 916 (SD Tex. 1976).

vinces us that § 1981 is applicable to racial discrimination in private employment against white persons.

First, we cannot accept the view that the terms of § 1981 exclude its application to racial discrimination against white persons. On the contrary, the statute explicitly applies to *"all* persons"* (emphasis added), including white persons. See, *e. g., United States* v. *Wong Kim Ark,* 169 U. S. 649, 675–676 (1898). While a mechanical reading of the phrase "as is enjoyed by white citizens" would seem to lend support to respondents' reading of the statute, we have previously described this phrase simply as emphasizing "the racial character of the rights being protected," *Georgia* v. *Rachel,* 384 U. S. 780, 791 (1966). In any event, whatever ambiguity there may be in the language of § 1981, see cases cited, *supra,* at 286 n. 16, is clarified by an examination of the legislative history of § 1981's language as it was originally forged in the Civil Rights Act of 1866. *Tidewater Oil Co.* v. *United States,* 409 U. S. 151, 157 (1972); *Immigration Service* v. *Errico,* 385 U. S. 214, 218 (1966). It is to this subject that we now turn.

The bill ultimately enacted as the Civil Rights Act of 1866 was introduced by Senator Trumbull of Illinois as a "bill . . . to protect *all* persons in the United States in their civil rights . . ." (emphasis added), and was initially described by him as applying to "every race and color." Cong. Globe, 39th Cong., 1st Sess., 211 (1866) (hereinafter Cong. Globe). Consistent with the views of its draftsman,[17] and the prevailing view in the Congress as to the reach of its powers under the enforcement section

---

[17] Cf. Cong. Globe 474:

"I take it that any statute which is not equal to all, and which deprives any citizen of civil rights which are secured to other citizens, is an unjust encroachment upon his liberty; and is, in fact, a badge of servitude which, by the Constitution, is prohibited." (Emphasis added.)

of the Thirteenth Amendment,[18] the terms of the bill prohibited any racial discrimination in the making and enforcement of contracts against whites as well as non-whites. Its first section provided:

"[T]here shall be no discrimination in civil rights or immunities among the inhabitants of any State or Territory of the United States on account of race, color, or previous condition of slavery; but the inhabitants of every race and color, without regard to any previous condition of slavery or involuntary servitude, . . . shall have the same right to make and enforce contracts, to sue, be parties, and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." *Id.,* at 211.[19]

---

[18] See generally, *e. g.,* Buchanan, The Quest for Freedom: A Legal History of the Thirteenth Amendment, 12 Hous. L. Rev. 1 (1974); Bickel, The Original Understanding and the Segregation Decision, 69 Harv. L. Rev. 1, 11–29 (1955). The Court has previously ratified the view that Congress is authorized under the Enforcement Clause of the Thirteenth Amendment to legislate in regard to "every race and individual." *Hodges* v. *United States,* 203 U. S. 1, 16–17 (1906); see *Jones* v. *Alfred H. Mayer Co.,* 392 U. S. 409, 441 n. 78 (1968).

[19] The bill's concern with equal protection of civil rights for whites as well as nonwhites is also expressed in its § 4, which referred, as introduced, Cong. Globe 211, and enacted, 14 Stat. 28, to "protection to all persons in their constitutional rights of equality before the law, without distinction of race or color." The same concern is reflected in the evolution of an amendment offered by Senator Trumbull to provide, at the beginning of § 1: "That all persons of African descent born in the United States are

While it is, of course, true that the immediate impetus for the bill was the necessity for further relief of the constitutionally emancipated former Negro slaves, the general discussion of the scope of the bill did not circumscribe its broad language to that limited goal. On the contrary, the bill was routinely viewed, by its opponents and supporters alike, as applying to the civil rights of whites as well as nonwhites.[20] The point was most directly focused on in the closing debate in the Senate.

hereby declared to be citizens of the United States . . . ." Cong. Globe 474. The amendment, accepted in principle, was itself amended to replace "all persons of African descent born in the United States" with "all persons born in the United States and not subject to any foreign power, excluding Indians not taxed," 14 Stat. 27. This provision was ultimately superseded by § 1 of the Fourteenth Amendment.

The congressional design to protect individuals of all races is further emphasized by re-enactment of the 1866 Act as part of the Enforcement Act of 1870, following ratification of the Fourteenth Amendment. See *Jones* v. *Alfred H. Mayer Co.*, *supra*, at 436.

[20] See, *e. g.*, Cong. Globe 504 (remarks of Sen. Howard, a supporter: "[The bill] simply gives to persons who are of different races or colors the same civil rights"); *id.*, at 505 (remarks of Sen. Johnson, an opponent: "[T]he white as well as the black is included in this first section . . ."); *id.*, at 601 (remarks of Sen. Hendricks, an opponent: "[The bill] provides, in the first place, that the civil rights of *all* men, without regard to color, shall be equal)." (Emphasis added.)

Respondents reasonably assert that references to the bill's placing Negroes' and whites' civil rights "upon precisely the same footing," *id.*, at 604 (remarks of Sen. Cowan, an opponent), and similar remarks might be read consistently either with the position that the measure was solely for relief of nonwhites, or with the position that it applies to protect whites as well. Respondents are unable, however, to summon any congressional debate from any stage in the bill's consideration to *contradict* the plain language of the bill as introduced and the explicit statements of Senator Trumbull, and others, that the bill, as introduced, did comprehend the prohibition of antiwhite discrimination.

During that debate, in response to the argument of Senator Davis of Kentucky that by providing for the punishment of racial discrimination in its enforcement section, § 2, the bill extended to Negroes a protection never afforded whites, Senator Trumbull said:

> "Sir, *this bill applies to white men as well as black men*. It declares that all persons in the United States shall be entitled to the same civil rights, the right to the fruit of their own labor, the right to make contracts, the right to buy and sell, and enjoy liberty and happiness; and that is abominable and iniquitous and unconstitutional! Could anything be more monstrous or more abominable than for a member of the Senate to rise in his place and denounce with such epithets as these a bill, the only object of which is to secure equal rights to all the citizens of the country, *a bill that protects a white man just as much as a black man?* With what consistency and with what face can a Senator in his place here say to the Senate and the country that this is a bill for the benefit of black men exclusively when there is no such distinction in it, and when *the very object of the bill is to break down all discrimination between black men and white men?*" *Id.,* at 599 (emphasis supplied).

So advised, the Senate passed the bill shortly thereafter. *Id.,* at 606–607.

It is clear, thus, that the bill, as it passed the Senate, was not limited in scope to discrimination against nonwhites. Accordingly, respondents pitch their legislative history argument largely upon the House's amendment of the Senate bill to add the "as is enjoyed by white citizens" phrase. But the statutory history is equally clear that that phrase was not intended to have the

effect of eliminating from the bill the prohibition of racial discrimination against whites.

Representative Wilson of Iowa, Chairman of the Judiciary Committee and the bill's floor manager in the House, proposed the addition of the quoted phrase immediately upon the introduction of the bill. The change was offered explicitly to technically "perfect" the bill, and was accepted as such without objection or debate. *Id.*, at 1115.

That Wilson's amendment was viewed simply as a technical adjustment without substantive effect is corroborated by the structure of the bill as it then stood. Even as amended the bill still provided that "there shall be no discrimination in civil rights or immunities among citizens of the United States in any State or Territory of the United States on account of race, color, or previous condition of slavery." [21] To read Wilson's amendment as excluding white persons from the particularly enumer-

---

[21] After Representative Wilson's "perfecting" amendments, § 1 of the bill provided:

"[A]ll persons born in the United States and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States, without distinction of color, and there shall be no discrimination in civil rights or immunities among citizens of the United States in any State or Territory of the United States on account of race, color, or previous condition of slavery; and such citizens of every race and color, without regard to any previous condition of slavery or involuntary servitude, except as a punishment for crime whereof the party shall have been duly convicted, shall have the same right to make and enforce contracts, to sue, be parties and give evidence, to inherit, purchase, lease, sell, hold, and convey real and personal property, and to full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." S. 61, 39th Cong., 1st Sess., House Print, Mar. 2, 1866.

ated civil rights guarantees of the Act would contradict this more general language; and we would be unwilling to conclude, without further evidence, that in adopting the amendment without debate or discussion, the House so regarded it.[22]

Moreover, Representative Wilson's initial elaboration on the meaning of Senator Trumbull's bill, which immediately followed his securing passage of the foregoing amendment, fortifies our view that the amended bill was intended to protect whites as well as nonwhites. As Wilson described it, the purpose of the measure was to provide "for the equality of citizens . . . in the enjoyment of 'civil rights and immunities.'" *Id.*, at 1117. Then, speaking in particular of "immunities" as "'freedom or exemption from obligation,'" he made clear that the bill "secures to citizens of the United States equality in the exemptions of the law. . . . Whatever exemptions there may be shall apply to all citizens alike. One race shall not be more favored in this respect than

---

[22] The provision generally forbidding "discrimination in civil rights or immunities . . . on account of race, color, or previous condition of slavery" was ultimately struck from the statute in the House. Cong. Globe 1366. This does not affect the analysis here, however, for two reasons. First, the debates make clear that the ground for objection to that provision, and the reason for its ultimate omission, was the breadth of the terms "civil rights and immunities," beyond those specifically enumerated in the second half of § 1, rather than an antagonism to the principle of protection for every race. See generally *Georgia* v. *Rachel,* 384 U. S. 780, 791–792 (1966); Bickel, *supra,* n. 18, at 11–29. Second, the point here is only that acceptance of respondents' interpretation of Congressman Wilson's amendment is inconsistent with the fact that the general provision against racial discrimination regarding civil rights remained in the bill *at the time of the amendment,* and was not removed until debate had focused on its particular ambiguities more than a week later.

another," *ibid.*[23]  Finally, in later dialogue Wilson made quite clear that the purpose of his amendment was not to affect the Act's protection of white persons. Rather, he stated, "the reason for offering [the amendment] was this: it was thought by some persons that unless these qualifying words were incorporated in the bill, those rights might be extended to all citizens, whether male or female, majors or minors."  Cong. Globe, App. 157.  Thus, the purpose of the amendment was simply "to emphasize the racial character of the rights being protected," *Georgia* v. *Rachel,* 384 U. S., at 791, not to limit its application to nonwhite persons.[24]

---

[23] Wilson also urged that the bill should pass

"to protect our citizens, from the highest to the lowest, from the whitest to the blackest, in the enjoyment of the great fundamental rights which belong to all men."  Cong. Globe 1118.

Wilson's view that the Act applied equally to protect all races was echoed by other supporters of the bill in the House, as it had been in the Senate.  See, *e. g.,* the remarks of Representative Shallabarger:

"Its whole effect is to require that whatever rights as to each of those enumerated civil . . . matters the States may confer upon one race or color of the citizens shall be held by all races in equality. Your State may deprive women of the right to sue or contract or testify, and children from doing the same.  But if you do so, or do not so as to one race, you shall treat the other likewise. . . .  It secures—not to all citizens, but to all races as races who are citizens—equality of protection in those enumerated civil rights which the States may deem proper to confer upon any races." *Id.,* at 1293.

See also *id.,* at 1159 (remarks of Rep. Windom); cf. *id.,* at 1118 (remarks of Rep. Wilson).

[24] Local 988 suggests that the pattern for Wilson's "as enjoyed by white citizens" amendment was similar language in § 2 of the civil rights bill which, as introduced by Senator Trumbull, Cong. Globe 211, and enacted, 14 Stat. 27, provided in pertinent part: "Any person who . . . shall subject . . . any inhabitant of any State or Territory . . . to different punishment, pains, or penalties . . . by

The Senate debate on the House version of the bill [25] likewise emphasizes that Representative Wilson's amendment was not viewed as limiting the bill's prohibition of racial discrimination against white persons. Senator Trumbull, still managing the bill on the floor of the Senate, was asked whether there was not an inconsistency between the application of the bill to all "citizens of every race and color" and the statement that they shall have "the same right to make and enforce contracts . . . *as is enjoyed by white persons,*" (emphasis supplied) and it was suggested that the emphasized words were super-

---

reason of his color or race, than is prescribed for the punishment of white persons, shall be deemed guilty of a misdemeanor, and, on conviction, shall be punished by a fine . . . or imprisonment . . . ." That this may have been the source of the language of the amendment hardly explains its meaning. As recited above, the prescriptive portion of the bill, § 1, provided, as introduced, see *supra,* at 288, and enacted, see n. 25, *infra,* and provides as currently codified, that punishments shall be equal for members of all races. Section 2 of the bill is no different, as it criminalizes the application of *"different* punishment, pains, or penalties" (emphasis supplied) whether greater or lesser than what white persons would be subject to. Even were we to read § 2 of the Act as protecting only non-whites, however, the significance of such a conclusion to the interpretation of § 1 would be slight; for we have previously explained that the 39th Congress apparently intended to apply criminal sanctions only to some, but not all, violations of the Act. See *Jones v. Alfred H. Mayer Co.,* 392 U. S., at 424–425.

[25] Cong. Globe 1367. Section 1 of the bill, as it then stood, and as it was ultimately enacted, provided in relevant part: "[A]ll persons born in the United States, and not subject to any foreign power, excluding Indians not taxed, are hereby declared to be citizens of the United States; and such citizens, of every race and color . . . shall have the same right, in every State and Territory in the United States, to make and enforce contracts . . . as is enjoyed by white citizens, and shall be subject to like punishment, pains, and penalties, and to none other, any law, statute, ordinance, regulation, or custom, to the contrary notwithstanding." 14 Stat. 27.

fluous. Cong. Globe 1413. Senator Trumbull responded in agreement with the view that the words were merely "superfluous. I do not think they alter the bill. . . . [A]nd as in the opinion of the [Senate Judiciary] [C]ommittee which examined this matter they did not alter the meaning of the bill, the committee thought proper to recommend a concurrence . . . ." *Ibid.*

Finally, after the Senate's acquiescence in the House version of the bill, *id.*, at 1413–1416, and the subsequent veto by President Johnson,[26] the debate in both the Senate and the House again reflected the proponents' views that the bill did not favor nonwhites. Senator Trumbull once more rejected the view that the bill "discriminates in favor of colored persons," *id.*, at 1758, and in a similar vein, Representative Lawrence observed in the House that its "broad and comprehensive philanthropy which regards all men in their civil rights as equal before the law, is not made for any . . . race or color . . . but . . . will, if it become[s] a law, protect every citizen . . . ." *Id.*, at 1833. On these notes, both Houses passed the bill by the prescribed margins, and the veto was overridden. *Id.*, at 1802, 1861.

This cumulative evidence of congressional intent makes clear, we think, that the 1866 statute, designed to protect the "same right . . . to make and enforce contracts" of "citizens of every race and color" was not understood or intended to be reduced by Representative Wilson's amendment, or any other provision, to the protection solely of nonwhites. Rather, the Act was meant, by its broad terms, to proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race. Unlikely as it might have appeared in 1866

---

[26] In his veto message, President Johnson recognized that the bill attempted to fix "a perfect equality of the white and black races." Cong. Globe 1679.

that white citizens would encounter substantial racial discrimination of the sort proscribed under the Act, the statutory structure and legislative history persuade us that the 39th Congress was intent upon establishing in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves. And while the statutory language has been somewhat streamlined in re-enactment and codification, there is no indication that § 1981 is intended to provide any less than the Congress enacted in 1866 regarding racial discrimination against white persons. *Runyon* v. *McCrary*, *ante,* at 168, and n. 8. Thus, we conclude that the District Court erred in dismissing petitioners' claims under § 1981 on the ground that the protections of that provision are unavailable to white persons.

The judgment of the Court of Appeals for the Fifth Circuit is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

MR. JUSTICE WHITE and MR. JUSTICE REHNQUIST join Parts I and II of the Court's opinion, but for the reasons stated in MR. JUSTICE WHITE's dissenting opinion in *Runyon* v. *McCrary*, *ante,* p. 192, cannot join Part III since they do not agree that § 1981 is applicable in this case. To that extent they dissent.