**John F. SHANLEY, Plaintiff,**

v.

**YOUNGSTOWN SHEET & TUBE COMPANY, Defendant.**

Civ. No. H80–84.

United States District Court,
N.D. Indiana,
Hammond Division.

Nov. 22, 1982.

Marvin E. Silverman of Ottenheimer, Silverman & Meinzer, East Chicago, Ind., for plaintiff.

Terrance L. Smith of Murphy, McAtee, Murphy & Costanza, East Chicago, Ind., for defendant.

### DECISION AND OPINION

POSNER,* Circuit Judge.

This civil rights complaint was filed on February 15, 1980, by John F. Shanley, a former employee of the Youngstown Sheet & Tube Company, against Youngstown and other defendants; all but Youngstown have been dropped. The complaint alleges that Shanley was forced into early retirement in violation of the Age Discrimination in Employment Act of 1967, as amended, 29

* Sitting by designation.

U.S.C. §§ 621 *et seq.,* and of the anti-retaliation provision of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a); but Shanley abandoned the age discrimination claim during trial. Shanley exhausted his administrative remedies under Title VII and received a "right to sue" letter from the Department of Labor.

The case was tried on January 25 and 26, 1982. The trial was limited to the question whether there was a violation of section 2000e–3(a). The following are my findings of fact and conclusions of law. Fed.R. Civ.P. 52(a).

Shanley went to work for Youngstown's Indiana Harbor Works, a steel works in East Chicago, Indiana, in 1940, first as a laborer, then as an equipment repairman. He remained an hourly employee (with interruption for military service in World War II) until 1957, when he became a salaried employee, first as Suggestion Investigator, then as Suggestion Coordinator, and in 1971 as Supervisor of the Employee Suggestion Program, all at the Indiana Harbor Works. His duty in these three posts was the same: to process suggestions received from plant workers for improvements in the plant's operations. Shanley would route suggestions to the worker's supervisor with a recommendation for a suitable monetary reward, and would handle the paperwork involved if it was decided to give the worker a reward. Shanley's was a one-man job; he had no staff to assist him. When he was terminated in 1977 he was earning a shade under $20,000. The evidence is uncontested that he carried out his responsibilities in a fully competent fashion.

Late in 1974 three employee-motivation programs at the Indiana Harbor Works were consolidated in a new Employee Motivation and Recognition Department under the direction of Tom Regeski, who in turn reported to George Lininger, the Manager of Employee Services. One of the programs was Shanley's (renamed "Employee Suggestion Systems"). Another was "MACH I," a "recognition" (that is, glory as well as cash) program for low-level management. It was headed by Tom Dale, who had been brought in from the Industrial Relations Department. The third was the "PRO Program," like MACH I a recognition rather than pure compensation program, but intended for hourly workers rather than salaried employees, and headed by Regeski. The PRO Program featured monthly dinners to which notables from the local community were invited and at which an outstanding worker, the "pro of the month," was celebrated.

Thus, the Employee Motivation and Recognition Department consisted of three managerial employees, one of whom, Regeski, wore two hats as head of the whole department and of one of its component programs.

The evidence is uncontested that Shanley's relations with Lininger and Regeski were poor. At one meeting Shanley told Lininger to his face that he was "lower than whale shit at the bottom of the ocean." (Shanley admitted this on cross-examination.) The tension between Shanley and Regeski seems to have stemmed in part from Shanley's very low opinion of the motivation programs (MACH I and PRO), as distinct from the pure compensation program that Shanley administered; he called the "pro of the month" concept "joke of the month." The personal styles of Shanley and Regeski are also very different. Shanley has no education beyond high school, spent many years as a factory worker, and despite his elevation to (the lowest rung of) management in 1957, when he was in his late thirties, retains the dress, speech, and general demeanor of a blue-collar worker. Regeski in contrast has a college degree and some postgraduate business training and his style is that of an executive. Shanley admitted that he found it irksome to work under Regeski, especially since Regeski was at the same time the supervisor of a competing program.

Kenneth Sanders, a black man, had been hired as a counselor in the Industrial Relations Department (which was also under Lininger's supervision) in 1972, and his office was near Shanley's. They became close personal friends. Sanders told Shanley that

he felt Lininger was treating him as a "token" black. The company discharged Sanders in August 1975. He complained to the East Chicago Human Rights Commission that he had been discharged because of his race. He told an investigator for the Commission, a Mrs. Dawkins, that Shanley could give her the names and addresses of potential witnesses. Mrs. Dawkins telephoned Shanley in December 1975. The conversation was evidently overheard by Regeski, whose office was near Shanley's. There was some dispute at trial whether Regeski could have overheard the conversation. Shanley's counsel put forth—but failed to substantiate—the alternative theory that Lininger had ordered Shanley's phone tapped. I find that Regeski did overhear the conversation. Regeski waited till Shanley had left for the day and then entered Shanley's office and searched the wastebasket. (He admitted this on the stand.) There he found the torn-up piece of paper on which Shanley had jotted down the names and addresses of potential witnesses, in preparation for Mrs. Dawkins' call, and from which he had read her the information over the phone. Regeski taped the scraps together and took them to Lininger.

There were no immediate repercussions. True, Shanley did not receive a merit increase in January 1976, but the circumstances of this denial were not explored at trial. However, the denial did lead Shanley to seek a meeting with Lininger, and after putting it off for several months Lininger met with him in June 1976. The meeting was stormy. Lininger confronted Shanley with the reconstructed list of names and addresses and told him that company rules forbade giving outsiders information about employees; no such rule was placed in evidence, however. Shanley testified at trial (and Lininger denied) that Lininger admitted that he had had Shanley's phone tapped and told him he would never get another merit raise. Shanley also testified that several days after the meeting Regeski told him that Lininger was "out to get him," "was going to break him," and regarded him as a "nigger lover." Yet no action was taken against Shanley.

Sanders, having received his right to sue letter from the EEOC, in December 1976 brought a Title VII suit against Youngstown, naming Lininger as an additional defendant. The suit was still pending in August 1977, when Shanley retired, but it was later dismissed.

In 1977 the Indiana Harbor Works fell on hard times—it was losing millions of dollars a month—and in August the manager of the works, William Rehn, received orders from corporate headquarters to reduce his management staff by 10 percent. Rehn told his supervisory employees, including Lininger, to reduce their staffs by 10 percent. Lininger offered to eliminate two of the three jobs in the Employee Motivation and Recognition Department, and proposed that Regeski be the surviving employee. Rehn approved the proposal. He was aware when he did so of Sanders' suit against the company.

On August 12, 1977, Lininger informed Shanley that the Employee Suggestion program was being eliminated, that there was no other suitable work for Shanley in the plant, and therefore that Shanley was being retired. Dale was transferred back to the Industrial Relations Department. In fact the Employee Suggestion program was not eliminated; it continues to this day. It was run by Tom Regeski for a while; at present it is run by Tom Dale, though he devotes only part time to it. Ironically, the MACH I and PRO programs no longer exist; they were terminated when Jones & Laughlin acquired the Indiana Harbor Works from Youngstown several years after Shanley's termination.

Out of the foregoing facts Shanley constructs the following theory: Lininger was determined to get rid of him in retaliation for his support of Sanders, who had sued not only Youngstown but Lininger himself. Lininger bided his time until he was directed to reduce his management staff, and he used the opportunity to get rid of Shanley. This is not an absurd theory; it may be the truth; but I am not persuaded it is.

There is no doubt that Lininger disliked Shanley or that one ingredient of this dislike was resentment at Shanley's assisting Sanders, whom Lininger had discharged, in Sanders' civil rights action against the company and against Lininger himself. But it does not follow that Lininger decided to retaliate against Shanley. There is no direct evidence that Lininger decided to terminate Shanley before he was told in August 1977 that he had to reduce his staff by 10 percent; and I will not infer simply from the history of bad relations between Lininger and Shanley that Lininger was set on retaliating against him. Lininger was a pretty small fish in Youngstown Sheet & Tube Company and if he carried out elaborate schemes of reprisal against competent employees his own employment would be jeopardized. There is no evidence that the manager of the Indiana Harbor Works, or any other officer of Youngstown, would have condoned Lininger's retaliating against Shanley.

Of course the directive to reduce his staff gave Lininger an opportunity to get rid of Shanley; and I have to decide whether the company's decision, on his recommendation, to get rid of Shanley rather than transfer Regeski to some other job in the plant and give Shanley Regeski's job was motivated in whole or in part by Shanley's support of Sanders' civil rights suit. I am convinced that Regeski would have been the survivor of the cutback of the Employee Motivation and Recognition Department, which no one suggests was improperly motivated, even if Kenneth Sanders had never existed. Lininger and Shanley had not gotten along well even before the Sanders termination and ensuing legal action, and Lininger had always been closer to Regeski than to either Dale or Shanley. Even more important, especially in Rehn's thinking, is the fact that the company at the time thought the PRO Program a more promising method of employee motivation than the employee suggestions program. The company may have been incorrect. Subsequent developments suggest it was incorrect, though there is evidence that the termination of the motivation programs was a byproduct of the Jones & Laughlin acquisition—that Jones & Laughlin had its own such programs and just wanted to eliminate duplication. But there is no evidence that the company was not sincere in wanting to push the PRO Program—this was, indeed, one of the reasons for Shanley's disaffection. There is also no evidence that Lininger was insincere in believing that the work of the Employee Motivation and Recognition Department could be handled by one man; no evidence was presented that the department was undermanned at any time after the reorganization in August 1977.

Now it is highly unlikely that, if Youngstown had to choose one man to run all three programs with emphasis on the PRO Program, that man would be Shanley rather than Regeski. Not only was Regeski identified with the program and Shanley with hostility to it, but (and this of course may explain Shanley's hostility) the program required a man with a certain facility in public speaking and gladhanding to organize the "pro of the month" dinners, the centerpiece of the program and to deal with the local notables invited to them. Shanley's working-class demeanor probably disqualified him in the eyes of management from running the PRO Program and hence from replacing Regeski as head, and sole managerial employee, of a shrunken Employee Motivation and Recognition Department.

I conclude that Shanley would have been retired when he was whether or not he had supported Kenneth Sanders' (or anyone else's) civil rights action; and if such support must be a "but for" cause of a plaintiff's termination to give rise to a cause of action under Title VII, as it would to give rise to a cause of action under 42 U.S.C. § 1983, see *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *McClure v. Cywinski,* 686 F.2d 541, 544–47 (7th Cir.1982), that is of course the end of the case. Although there is less authority on this question than one would expect, it seems generally assumed that there is no violation of Title VII unless the discriminatory or retaliatory behavior is a "but for"

cause of whatever adverse action—termination or demotion or failure to promote or, as here, forced retirement—is complained of. See, e.g., *McDonald v. Sante Fe Trail Transp. Co.*, 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976). There are some holdings to this effect. E.g., *De Volld v. Bailar*, 568 F.2d 1162, 1164 (5th Cir.1978); *Fisher v. Flynn*, 598 F.2d 663, 665 (1st Cir.1979).

However, a recent article challenging the use of a "but for" causation requirement in Title VII cases leads me to go on. Brodin, *The Standard of Causation in the Mixed-Motive Title VII Action: A Social Policy Perspective*, 82 Colum.L.Rev. 292 (1982), argues that while a prevailing plaintiff is not entitled to reinstatement or back pay if he fails to show that but for the alleged violation of Title VII he would not have been terminated, still this showing is not necessary to prove the violation itself; proof of violation might entitle the plaintiff to some sort of declaratory or injunctive relief (not sought here) and to attorney's fees (which are sought here). Using this approach, if I concluded that Lininger would have found some way of getting rid of Shanley in retaliation for his support of Sanders, this would establish a violation of Title VII and entitle Shanley to an award of attorney's fees, but not to reinstatement or back pay, since, as I have found, Shanley would have been let go anyway in August 1977 because of economic conditions at the Indiana Harbor Works. The same result would follow if, more plausibly, I found that Lininger's desire to retaliate was part of the motivation for getting rid of Shanley, even though there was another and sufficient motivation that was not unlawful.

I reject this approach to the problem of "mixed motivation." One has to distinguish between two types of case. In the first, there is hostility to an employee because of his race or his support of an alleged victim of racial discrimination, and there is also some lawful motivation for getting rid of him; but the latter is not sufficient to cause his discharge in the absence of hostility on racial or other forbidden grounds. In such a case the invidious grounds are suffi-cient to make out a violation. But if the employee would have been fired anyway, I do not think the presence of invidious grounds should create a violation of law. It would not in a tort case, of course; and while Title VII is not a tort statute in any conventional sense, when invoked by an employee seeking reinstatement and back pay it is enough like a tort case to make the tort standard of causation the most sensible to apply. The absence of causation makes the suit one purely for attorney's fees. Such a suit places a burden on the courts that is disproportionate to the slight increment in compliance with the civil rights laws that such suits might bring about.

In any event, I am not persuaded that retaliatory motivation played any role in Shanley's discharge. I do not think Lininger's recommendations or Rehn's approval would have been any different if Lininger had harbored no animus toward Shanley based on Shanley's support of Sanders.

For the foregoing reasons, I shall enter judgment for the defendants dismissing the complaint in its entirety and with prejudice. Each party shall bear its own costs of suit.