**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0602n.06
File Name: 09a0602n.06

No. 08-4403

**FILED**
AUG 25, 2009
LEONARD GREEN, Clerk

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| NED CAMERON, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| STATE OF OHIO (DEPARTMENT OF YOUTH | ) | |
| SERVICES), c/o Thomas Strickrath, Director, | ) | |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

BEFORE: BOGGS, ROGERS, and WHITE, Circuit Judges.

ROGERS, Circuit Judge. Plaintiff Ned Cameron, an African-American, worked as a parole officer for defendant Ohio Department of Youth Services (DYS) for fifteen years. DYS terminated Cameron, allegedly for failing to complete his progress reports in a timely fashion. Cameron brought suit against the DYS, claiming that he was discriminated against because of his race and age. Although the district court initially denied DYS's motion for summary judgment, the court reconsidered its position and found that Cameron was not similarly situated to any other employees, and therefore that Cameron could not make out a prima facie case of discrimination under Title VII. In doing so, the court properly determined that DYS was entitled to summary judgment because

1

Cameron has not shown that he was treated differently than similarly situated employees were treated.

In 1990, Cameron began working for the DYS in Columbus, Ohio. Cameron was hired as a social worker, but later took a job as a parole officer covering a rural area. In that position, Cameron supervised juvenile offenders on parole; his duties included counseling, ensuring compliance with release requirements, and attending court proceedings. DYS required Cameron to prepare and file reports regarding each parolee's progress. Cameron attended training on how to file these reports.

In early 2005, Cameron was subject to disciplinary action that led to his transfer to the Dayton, Ohio region. At a disciplinary hearing in January 2005, DYS determined that Cameron had failed to submit his reports and had inaccurately reported information in his reports. DYS discharged Cameron, effective February 17, 2005. In response, Cameron filed a grievance, stating that he had been removed without just cause. Cameron also filed a charge with the Ohio Civil Rights Commission, alleging that DYS discriminated against him on the basis of race, disability, and age. Cameron and DYS settled their dispute in a formal agreement that allowed Cameron to keep his job. Pursuant to that agreement, Cameron was suspended for fifteen days, he voluntarily transferred to the Dayton, Ohio region, and he agreed to withdraw his civil rights complaint.

Cameron worked as a parole officer in DYS's Dayton region from April 4, 2005, until November 25, 2005. Cameron again served in a rural area; he worked in the field from Monday through Thursday and in the Dayton office on Fridays. Cameron checked in with his supervisor, Kevin Shepherd, every day. Cameron's duties in Dayton were similar to those of his prior position,

and included submitting reports regarding the parolees within certain time frames. However, Cameron alleges that the Dayton office's reporting procedures were more rigorous than those in Columbus, and that he was not properly trained to complete these reports. Cameron used a DYS-issued laptop to prepare these reports and received computer training on how to use the laptop for this purpose. Kathryn Benton, Cameron's predecessor, worked with Cameron for two weeks to familiarize him with the position. Benton completed all the assigned reports during this transition period. Cameron received additional training regarding case management two months into his tenure in the Dayton region.

Cameron allegedly had difficulty completing his reports in a timely fashion. Less than six weeks after Cameron assumed his caseload, he was delinquent on 30 reports. In May 2005, DYS determined that Cameron was delinquent on his reports, and Shepherd required Cameron to come in to the Dayton office every day for a two-week period to reduce this backlog. Cameron, however, was unable to complete all his outstanding reports in this time period. Shepherd next requested that Cameron and his union advisor create an action plan describing how Cameron planned to catch up on his work by July 15, 2005. Cameron submitted, and Shepherd approved, such a plan whereby Cameron would work from the office until July 15. Cameron received more training about using his laptop to complete the reports. Cameron did not become current on his reports in the time allotted.

DYS investigated the situation and terminated Cameron's employment. On October 25, 2005, a pre-disciplinary hearing was held and the hearing officer determined that Cameron's failure to timely comply with the report deadlines violated DYS policy. Cameron cited several reasons for his delinquency, including: a broken laptop, an inability to understand the reports, an inability to use

the computer, a heavy case load, and a high amount of travel. The hearing officer noted, however, that Cameron had received additional office support and computer training, that Cameron was given an up-to-date caseload when he began the job, and that Cameron chose to cover the rural area to which he was assigned. The hearing officer found just cause for discipline, and terminated Cameron.

Cameron now asserts that Shepherd was sabotaging his reports and manipulating the tracking sheets to show that Cameron was late on his reports. Cameron alleges that, in some instances, he was charged with having incomplete reports though those reports were either actually complete or incorrectly attributed to him. Cameron also alleges that some reports were tracked as "late" when their due date was over a weekend. Cameron never raised these issues to his union representative.

Cameron also alleges that he was treated differently than other employees supervised by Shepherd were treated. Shepherd supervised six parole officers. One of these employees was Sarah Thompson, who is Caucasian. Thompson was a probationary employee at the time of Cameron's discharge, because she was new to the parole officer position. Thompson was never disciplined for late reports, and her mid-probation progress review stated that she completed reports on time 99% of the time. However, the progress review marked her as failing to meet her goal of completing reports on time.

On October 17, 2006, Cameron filed suit against DYS in the U.S. District Court for the Southern District of Ohio, alleging that DYS discriminated and retaliated against him on the basis of his race and age in violation of Title VII and the ADEA. Magistrate Judge King was assigned to

the case, with the parties' consent.[1] Upon DYS's motion, the court dismissed the age discrimination claims. DYS then moved for summary judgment on the remaining claims. The court granted summary judgment on the retaliation claims, and denied summary judgment on the race discrimination claims. *Cameron v. Ohio*, No. 2:06-CV-871, 2008 WL 2002560, at *1 (S.D. Ohio May 7, 2008). The court determined that Cameron had raised a genuine issue of material fact about whether another similarly situated employee, Thompson, was treated more favorably, and therefore that the claim warranted trial. *Id.* at *8-12.

DYS moved the court under Fed. R. Civ. P. 59(e) for reconsideration of the order. The court determined that Cameron was not similarly situated to Thompson, and therefore a clear error of law had occurred because Cameron could not make out a discrimination claim. *Cameron v. Ohio*, No. 2:06-CV-871, 2008 WL 4186313, at *4-5 (S.D. Ohio Sept. 4, 2008). The court granted DYS's motion for reconsideration and granted summary judgment in favor of DYS. *Id.* at *5. Although the court treated DYS's motion as one brought under Rule 59(e), the court's initial denial of summary judgment was not a final judgment and the "strictures" of Rule 59(e) did not, therefore, apply. *See Russell v. GTE Gov't Sys. Corp.*, 141 F. App'x 429, 436 (6th Cir. 2005). Rather, DYS's motion was effectively a renewed motion for summary judgment and "[t]he district court was therefore free to reconsider or reverse its decision for any reason." *Id.*; *see also Whitford v. Boglino*, 63 F.3d 527, 530 (7th Cir. 1995). Cameron now appeals.

---

[1] Actions of the Magistrate Judge are accordingly referred to as actions of the district court. *See* 28 U.S.C. § 636(c).

DYS was entitled to summary judgment because Cameron was not treated less favorably than similarly situated non-protected employees were treated. Having no evidence of direct discrimination,[2] Cameron's Title VII claim, 42 U.S.C. § 2000e, relies on indirect evidence under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), framework. The parties agree that Cameron meets the first three factors of the *McDonnell Douglas* test. They disagree over the final factor: whether Cameron has shown that he was treated less favorably than similarly situated non-protected employees under *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582-83 (6th Cir. 1992). On appeal, Cameron asserts that he was similarly situated to employee Thompson.[3]

DYS was entitled to summary judgment because Thompson was not sufficiently comparable to Cameron. Thompson and Cameron did not "engage[] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* at 583. Thompson and Cameron differed in their ability (or lack

---

[2] On motion for summary judgment, DYS contended that the only evidence of direct discrimination was the warning of Teresa Fitts-Ardley, Cameron's union representative, "to be very careful" of Shepherd. Motion for Summary Judgment 10, *Cameron v. Ohio*, No. 2:06-CV-871 (S.D. Ohio Oct. 18, 2007). The court found that this did not constitute direct evidence. Cameron abandoned any such claim on appeal: "The fact that there is no direct evidence of discrimination is completely insignificant." Appellant's Br. at 21.

[3] On summary judgment, Cameron argued that he was similarly situated to four employees: Thompson, Kyle Dickinson, Rita Warrion, and Kathryn Benton. On appeal, however, Cameron mentions the other three employees but does not develop his legal argument regarding them. "[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995 (6th Cir. 1997) (citation omitted). Even if we were to consider the other employees, we would not find them comparable for the reasons stated in the district court's first decision. *Cameron*, 2008 WL 2002560, at *8-10.

thereof) to complete reports in a timely fashion. According to DYS, Thompson exhibited no performance deficiencies and her mid-probation review stated that "Ms. Thompson does an outstanding job of submitting her reports on time. She has submitted better than 99% of her reports on time." Shepherd Aff. 1 ¶ 21 & Exhibit A. Despite this, Thompson's review marked her as failing to achieve her goal of submitting reports in a timely manner. Cameron asserts that this inconsistency is evidence of bias or evidence that the form was altered. In viewing the facts in the light most favorable to Cameron, it may be possible to assume that Thompson did fail to complete some portion of her reports in a timely fashion. However, there is no indication that Thompson's shortcoming was anywhere near as significant as Cameron's. Cameron was logged as being late on 30 reports in April 2005, 56 reports in July 2005, 66 reports in August 2005, 62 reports in September 2005, and 62 reports in October 2005. Even if these numbers are not entirely accurate, as Cameron asserts, Cameron does not dispute that he was late on a large enough volume of reports to be subject to repeated disciplinary action. This surpasses Thompson's alleged lateness, which the evidence supports is between 99% on time and always timely. Cameron presents no evidence that any deficiency on the part of Thompson was of "'*comparable seriousness*'" to his own. *Stotts v. Memphis Fire Dept.*, 858 F.2d 289, 298 (6th Cir. 1988) (quoting *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)). Cameron "has failed to eliminate the most common nondiscriminatory reason[] for the differences in the . . . discipline handed down by" DYS. *Id.*

Additionally, Cameron had a longer tenure with the DYS than Thompson, which was a "differentiating . . . circumstance[]" that accounts for DYS's differing treatment. *Mitchell*, 964 F.2d at 583. Cameron had been working at DYS for fifteen years whereas Thompson was a new

employee. DYS could have been less willing to forgive an employee's inability to complete reports in a timely fashion given extensive experience, than to forgive a similar deficiency in an employee just learning the ropes.

Finally, none of Cameron's reasons why he was unable to complete his reports in a timely fashion is relevant under the *McDonnell Douglas* analysis. For instance, Cameron alleges that he was not able to work on his computer with proficiency, that the Dayton office had new and more difficult reporting requirements than he experienced in Columbus, that his predecessor failed to train him on the Dayton office reporting, and that he had more cases than the average rural parole officer. However, Cameron does not allege that other employees received more training or additional help on their reports, but only that his job was in itself difficult to complete. These explanations do not show that Cameron was being treated differently than similarly situated employees were treated.

AFFIRMED.