Curtis **WORTHY**

v.

**U. S. STEEL CORPORATION.**

**Civ. A. No. 74–2689.**

United States District Court,
E. D. Pennsylvania.

Dec. 8, 1980.

---

Michael Churchill, Philadelphia, Pa., for plaintiff.

Henry Reath, Philadelphia, Pa., for defendant.

## AMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW

NEWCOMER, District Judge.

The essential facts of this case are set forth at 472 F.Supp. 1304 (E.D.Pa.1978) and 616 F.2d 698, (3d Cir. 1980), and need not be repeated here. The findings that follow are supplemental thereto.

*Findings of Fact*

1. The plaintiff was the first black person to become a crane operator in the 80 Inch Hot Strip Mill. For eleven years, from 1968 to trial in 1977, the only black cranemen in the 80 Inch Hot Strip Mill were Curtis Worthy, Allen Edwards and Warren Hallback. After the demotion of Mr. Worthy and Mr. Hallback, the work force consisted of one black craneman and thirty-two white cranemen.

2. Crane operator is a prestigious position in the 80 Inch Hot Strip Mill; operators are high above the work floor in air-conditioned cabs, and they have significant responsibilities.

3. A number of crane operators have been disciplined for safety infractions. The issuance of a discipline slip for a safety violation is an indication that the company considers the safety infraction to be serious.

4. Plaintiff Worthy was not disciplined more harshly for his safety violations than were similarly unsafe white cranemen.

(a) Worthy committed eight infractions involving the operation of his crane: three of them were for unsatisfactory work, one was a safety violation, one was for "carelessness," and three involved crane collisions. This last statistic is most startling; no other employee had been involved in three crane collisions.

On July 7, 1968, while Worthy was working the crane, he struck a roll sitting on the floor causing a roll boom to swing around, forcing men on the floor to scatter for safety. (Tr. 103a) William Kurtz, Worthy's supervisor at the time, wrote a memo to Worthy's file describing the incident and indicating that Worthy's co-workers thought it unsafe to work with him. (Tr. 103a) Andrew J. Downey, Line Foreman at the Red Mill plant, was Worthy's foreman for about a year and worked with him when he was a craneman. During this time, Downey supervised fourteen other cranemen. (Tr. 864a) In Downey's opinion, Worthy was a poor craneman. (Tr. 865a). Downey gave as an example of Worthy's inadequacy the fact that when Worthy unloaded rolls coming out of the roll shop, Downey would have to put two men on the floor to hold the spreader apart to keep it from swaying. (Tr. 866a). Downey also received several safety complaints about Worthy from operators on the floor. (Tr. 867a).

On March 22, 1969, Worthy ran his crane into another crane which was in the process of installing a blocker set. (Tr. 106a, 107a, 455a). Worthy received a discipline slip for the infraction and a written warning that any further violation of rules would result in more severe discipline. (Tr. 455). The report involving this incident states that there was nearly a serious accident caused by the collision. Apparently, a maintenance man's hand was caught between the lifting cable and coiler because the crane that was struck moved and shifted the work. (Tr. 107a).

On December 10, 1969, Worthy bumped his crane into another crane which was in the process of taking coils off a buggy. (Tr. 396, 441, 111a). After the incident, Worthy did not stop his crane but kept operating it. (Tr. 397). He was given a disciplinary slip and suspended for one day. (Tr. 111a, 398). The report of this incident

reveals that the operator of the struck crane slid off the seat and injured his left knee. (Tr. 113a). The report also states that the collision drove the struck crane approximately five to six feet. (Tr. 112a).

On January 17, 1970, Worthy committed his most serious infraction, for which he received a disciplinary slip and a three-day suspension. (Tr. 114a). The incident consisted of the following events: Worthy pulled a cable off the roller table. (Tr. 399). He took the hoist up and kept it hanging straight. He stopped and bridged south and "pulled the trolley." (Tr. 399). At that point, the block, which is that part of the crane that is considered the hoist, dropped. (Tr. 739a). In order for the block to be dropped the crane cables must be cut. When this happens, the block drops from a height of thirty to fifty feet onto the work floor where workers may be. A dropped block is considered a very serious matter.

On March 20, 1971, Worthy was operating his crane and was called to take some scrap metal from the coil pit by the pitman. (Tr. 290). He proceeded to remove the scrap, bridged north and, when he reached his destination, crashed into the crane of Weaver, a co-worker. (Tr. 290). For this accident, he received a disciplinary slip and five days suspension with an extension of five days. (Tr. 116a). He was then demoted. (Tr. 322).

The gravity of this incident becomes apparent when one considers the circumstances of the accident and the company rules that were violated after the accident occurred. Worthy testified that he was going full speed when he hit the other crane (Tr. 508a) and that he gave Weaver's crane a "pretty hard whack." (Tr. 509a) According to the accident report of J. A. Davis, Worthy's foreman, who is black (Tr. 703a), the impact caused Weaver to be thrown from the cab, striking his shoulder against the door jamb. (Tr. 119a) Weaver went to the dispensary (Tr. 512a), and, according to his medical case record (Tr. 121a) suffered a contusion to his right shoulder and post-lumbar pain.

After the collision, Worthy violated two extremely important company rules: he continued to operate his crane, and he did not report the accident. Worthy knew that the company has an absolute rule that when one has a crane accident, one must stop the crane and cannot move it until a motor inspector inspects it. (Tr. 495a, 513a, 579a, 580a) Operation of a crane after a collision is a violation of plant rules and procedure. (Tr. 707a) The purpose of this safety rule is to enable an inspection of the crane to ascertain that there is no loose debris in any part of it that may fall off and cause injuries to workers on the floor. (Tr. 708a, 715a) Worthy knew that he had an absolute duty to report an accident involving any injury. (Tr. 502a)

After it was discovered that the collision had occurred, the company made an inspection of Worthy's crane and reported that the power, electricity and brakes were in proper order. (Tr. 126a, 127a)

Foreman Davis' report on the accident related that Worthy told him that he fell asleep while operating the crane. (Tr. 124a, 711a) In an interview with the Equal Employment Opportunity Commission, Worthy stated that he may not have been as alert as he should have been. (Tr. 129a, 573a) Although Worthy disputes his statement contained in Davis' report, the Court finds his testimony on this point not believable.

(b) The following white cranemen were demoted from cranemen to lesser positions. An examination of the reasons for which they were demoted reveals that their work records and violations were of a type either similar to or less serious than Worthy's.

*P. Yandrick* (Tr. 226a to 236a)

This employee was operating a crane in such a fashion as to cause it to hit the end stop bumper. The lights on the crane went out, and the trolley jumped the track. The damage to the crane was so extensive that the maintenance department issued instructions not to operate it. It was out of service for three days. There were no injuries. Yandrick had a good report except for this incident.

*P. Margerum* (Tr. 237a to 241a)

This employee was demoted because he was an "unsafe, reckless and inefficient crane operator." (Tr. 239a) Gilbert G. Pugh, General Foreman of the Slab Yard in the 80 Inch Hot Strip Mill, United States Steel, testified that after having given Margerum a "fair trial" in the crane, he felt that Margerum was not operating the crane safely. (Tr. 891a)

*P. Borden* (Tr. 242a to 252a)

This employee received a written reprimand for failing to follow directions properly. He was subsequently demoted. The demotion was necessary because Borden's foremen felt that he was not capable of mastering the required techniques for operating the crane properly. Seven memoranda were produced at trial from foremen indicating Borden's inability properly to operate the crane. This demotion was not in the nature of a disciplinary action, but rather an accumulation of unsatisfactory performance. Pugh testified that after observing Borden over a period of time, he felt he could not run the crane safely. (Tr. 891a, 892a)

*C. Bianco* (Tr. 262a to 267a)

This employee departed the cab of his crane when the crane was not properly disconnected and the crane started to move. Bianco was subsequently demoted.

*E. Yankoski* (Tr. 259a to 261a)

Yankoski twice operated the crane so as to break a top work roll. The second time he did this, he was demoted. It is important to note that his demotion came after *no other crane collisions.*

5. Worthy was properly removed from his duties as a crane operator. His conduct was a threat to the safety of fellow workers. His safety record was sufficient reason, in itself, for the company to have removed him from the crane.

6. Plaintiff directs the Court's attention to the discipline meted out to white employees whom he contends had similar infraction records but were not disciplined as severely as Worthy. However, each of the four employees cited—Guye D. Craig, William Foldes, George L. Hozdulick and G. L. Teenie—had only one crane collision as compared to Worthy's three collisions. In addition, an examination of the discipline given to Craig, Hozdulick and Teenie regarding their crane collisions shows that Worthy was, in fact, not disciplined after his first collision as severely as they were: Craig was given a three day suspension for his crane collision, Hozdulick was given a two day suspension for his crane collision, Teenie was given a five day suspension for his crane collision. Worthy was given only a written warning for his first crane collision. In fact, Worthy was disciplined less severely for his second crane collision, being given only a one day suspension, than Craig, Hozdulick or Teenie were for their separate crane collisions. Plaintiff has also failed to produce any evidence of any craneman who was responsible for a dropped block. Thus, Worthy's safety record was both qualitatively as well as quantitatively inferior to the records of white cranemen.[1]

7. Intent is seldom capable of direct proof, and often a determination of the reasons underlying an action requires inference based in large part on common sense and intuition. The Court finds as a fact that Worthy was demoted because while he was operating a crane he was a threat to his co-workers' safety, that his race was not a cause of his demotion.

*Conclusions of Law*

The Court's original finding of no liability was based on two facts which remain true: (1) Worthy deserved to be removed from the crane, and (2) some white crane operators (who were arguably similarly situated) had been demoted for similar infractions. Upon the direction of the Court of Appeals, the Court has examined the testimony regarding the "comparable" white cranemen who were not demoted. Having done so, a third factual finding is established: (3) the white crane operators who were not demot-

---

1. Some of the white cranemen did indeed have more warnings than did Worthy, but they were not related to collisions, but rather to less significant infractions, e. g., "horseplay."

ed had safety records that were distinguishable from Worthy's by virtue of the severity of the safety infractions reported.

The Court is extremely reluctant to substitute its own judgment regarding safety matters for the judgment of Worthy's employers, supervisors, and co-workers. However, when the inquiry is directed toward the intent of the employer, as it is here, the Court must indeed delve into the *bonafides* of the employer's decision. In doing so, the Court must consider the reasonableness of the categories of safety infractions, and the regularity with which the employer imposes penalties for infractions. Indeed, even if Worthy was demoted, both because he was black *and* because he was a dangerous worker, there would be impermissible discrimination. For that last reason, the Court examined carefully the allegedly comparable safety records of the white crane operators who were not demoted. The Court found that those safety records were not actually comparable.

The Court notes that in comparing the records of the various cranemen with safety infractions, that precise equivalents, *Mc-Donald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273, 283 n.11, 96 S.Ct. 2574, 2580 n.11, 49 L.Ed.2d 493 (1976), would be well nigh impossible to ascertain. In the area of safety regulations, there must be some ordering of severity rather than a mere addition of incidents. The record shows that cranemen who committed infractions that were considered less serious and dangerous were not demoted. Cranemen who committed infractions that were considered more serious and dangerous, such as crane collisions, were demoted. Of all the cranemen, though, Worthy was the only one who dropped a block on the work floor. That infraction stands out as excessively dangerous and, *in and of itself*, differentiates Worthy from the cranemen who were not demoted.

In light of the above finding, it is clear to this Court the defendant's reason for demoting Worthy cannot be labeled "pretextual." Had Curtis Worthy been a white crane operator, he would have been demot-

ed. That being the case, the Court cannot find that defendant treated Worthy less favorably as to the "terms, conditions, or privileges in employment, because of [his] race." 42 U.S.C. § 2000e–2(a)(1).