Yvette W. DUGGAR, Plaintiff,

v.

Clarence THOMAS, Chairman, Equal Employment Opportunity Commission, Defendant.*

Civ. A. No. 78–1366.

United States District Court, District of Columbia.

Oct. 29, 1982.

Jose A. Rivera, Washington, D.C., for plaintiff.

Gloria J. Lett, Anthony J. DeMarco, Equal Employment Opportunity Commission, Washington, D.C., for defendant.

## MEMORANDUM OPINION

JOYCE HENS GREEN, District Judge.

Plaintiff, a black female, instituted this action under Title VII of the Civil Rights Act of 1964[1] as augmented by the Equal Employment Opportunity Act of 1972[2] alleging that she was the victim of racial discrimination in the course of her employment at the Equal Employment Opportunity Commission ("EEOC" or "Commission").

---

* Clarence Thomas, Chairman of the Equal Employment Opportunity Commission, has been substituted for a predecessor, Eleanor Holmes Norton; Ethel Bent Walsh, Vice-Chairman, EEOC, and Daniel E. Leach, Commissioner, EEOC, defendants named in the complaint, have been dismissed pursuant to stipulation.

1. Public Law No. 88–352, Title VII, 78 Stat. 253 (1964), as amended, 42 U.S.C. §§ 2000e et seq. (1976).

2. Public Law No. 92–261, 86 Stat. 103 (1972), as amended, 42 U.S.C. §§ 2000e et seq. (1976).

Specifically, plaintiff asserts that she was discriminatorily disciplined by defendant because one or more of three similarly situated white persons guilty of like performance deficiencies were not disciplined. She further avers that one or more of three similarly situated white persons were granted favorable treatment by defendant with respect to acts for which plaintiff and the white persons were accused and that she was not accorded such favorable treatment or consideration. Plaintiff overall contends that as a black person she has been denied terms and conditions of employment equal to those of white persons similarly situated. The defendant, asserting that plaintiff's demotion resulted from her dereliction of duty, denies disparate treatment or that the plaintiff was singled out for adverse action in a selective and discriminatory manner.

The cause was tried to the Court. Numerous stipulations were reached, witnesses testified, and substantial documentation was admitted into evidence.

For reasons demonstrated by the findings and conclusions of law noted within this Opinion, the Court concludes that plaintiff has not prevailed on her claim of racial discrimination and that judgment must be entered in favor of the defendant.

At time of trial, Yvette W. Duggar was employed by the EEOC as Field Manager, GS–15. She had brought to this agency in 1969 her prior work activity with Federal City College as Deputy and Acting Comptroller, with the Peace Corps as a budget officer, and her 15 years' experience with the Department of State in various positions in personnel and accounting and as both budget analyst and officer.

As the GS–15/1 Director, Office of Administration, from December 1969 to March 1971, Ms. Duggar was responsible for budget, financial management and procurement matters of the Commission. Initially, the Commission's accounting records were maintained by the General Services Administration (GSA), based upon obligating and expenditure data provided by the Office of Administration. In July, 1970, upon the recommendation of plaintiff and with the concurrence of then EEOC Chairman William Brown, III, the Commission, under the direction of plaintiff, in preparation for Commission assumption of the accounting function, commenced development of accounting principles and standards.

The Commission underwent a reorganization in March 1971 pursuant to which the Office of Administration was redesignated Office of Management. Named Director of that office, plaintiff was promoted to a GS–16 in June 1971. Reporting to the EEOC's Chairman as his principal advisor on all administrative matters, Duggar's responsibilities now included planning and directing administrative functions, which embraced budget preparation and execution, all fiscal accounting and auditing matters, personnel management and utilization, procurement and personal service contracting, supply and office management. The Office of Management, with a staff of 135, encompassed seven Divisions: Financial Services (referred to alternatively, as Financial Management), Management and Organization, Administrative Services, Personnel, Systems and Controls, Audio-Visuals and Library.

By October 1971 the responsibility for control of obligations and expenditures, and the maintenance of reliable accounting records, was no longer shared with the GSA.

Administrative control over appropriations and funds became increasingly important, stimulating EEOC Order No. 445, the stated purpose being to prescribe

. . . a system of administrative control over appropriations or funds of the Equal Employment Opportunity Commission. It is designed to restrict obligations and/or expenditures to amounts made available through apportionment by the Office of Management and Budget and to permit the fixing of responsibility for any violation of the Anti-Deficiency Act, Section 3679 of the Revised Statutes, as amended (31 U.S.C. 665).

The Anti-Deficiency Act, *inter alia,* prohibits the incurrence of obligations or ex-

penditure of funds in excess of the amounts appropriated by Congress or apportioned by the Office of Management and Budget (OMB).[3]

Under the umbrella of this order, effective January 12, 1973, the plaintiff was made EEOC's allottee with authority delegated to her as Director of Management, "to sign the Commission's requests for apportionment and reapportionment" and

... to incur obligations within a specified amount pursuant to an apportionment or reapportionment of the EEOC appropriation. No obligation may be incurred except pursuant to authority granted by the allottee after ascertaining the availability of funds, and no disbursement of funds may be certified except with respect to an obligation so authorized. Any employee of the Commission who incurs an obligation without having first secured proper authorization from the allottee shall be in violation of these regulations.[4]

Ms. Duggar's responsibilities as allottee were specified:

... The Director, Office of Management, shall be held responsible for restricting obligations and disbursements to amounts apportioned by OMB. The Director shall establish procedures for providing controls and maintaining records to indicate the status of the funds available for obligation. The Director shall make a

prompt report to the Chairman whenever it appears that a violation of Section 3679 of the Revised Statutes, as amended, may have occurred.

Order No. 445 further provided that the Commission's Chairman fix responsibility for all violations of the Anti-Deficiency Act,[5] defined as "the obligation or disbursement of funds in excess of amounts allotted," and immediately forward a report of same to the President, through OMB, and to the Congress in accordance with OMB directives.

From entry in 1969 and until December 1973, Duggar's work performance was not challenged. She received only one evaluation—"excellent"—from Chairman Brown.

The term of Chairman Brown (black) expired in late 1973 and John H. Powell, Jr. (black) succeeded him as Chairman. In February 1974, Harold Fleming (black) was detailed to the Commission from the then Department of Health, Education and Welfare as a GS-15 in the Office of Program Planning and Evaluation.

Whatever the scope of the exchanges between Fleming and plaintiff, it is clear that plaintiff was aware of Fleming's concern about the Commission's accounting records and the reconciliation of the fiscal year (FY) 1974 books for the year ending June 30, 1974.

3. 31 U.S.C. § 665(a):

"No officer or employee of the United States shall make or authorize an expenditure from or create or authorize an obligation under any appropriation or fund in excess of the amount available therein; nor shall any such officer or employee involve the Government in any contract or other obligation, for the payment of money for any purpose, in advance of appropriations made for such purposes, unless such contract or obligation is authorized by law."
    31 U.S.C. § 665(h):
"No officer or employee of the United States shall authorize or create any obligation or make any expenditure (A) in excess of any apportionment or reapportionment, or (B) in excess of the amount permitted by regulations prescribed pursuant to subsection (g) of this section."

4. 31 U.S.C. § 665(i)(1):

"In addition to any penalty or liability under other law, any officer or employee of the Unit-

ed States who shall violate subsection (a) or (h) of this section shall be subjected to appropriate administrative discipline, including, when circumstances warrant, suspension from duty without pay or removal from office; and any officer or employee of the United States who shall knowingly and willfully violate subsections (a) or (h) of this section shall upon conviction, be fined not more than $5,000 or imprisoned for not more than two years, or both."

5. 31 U.S.C. § 665(i)(2):

"In case of a violation of subsections (a) or (h) of this section by an officer or employee of an agency, or of the District of Columbia, the head of the agency concerned or the Commissioners of the District of Columbia, shall immediately report to the President, through the Director of the Bureau of the Budget, and to the Congress all pertinent facts together with a statement of the action taken thereon."

It is undisputed that plaintiff was the agency's allottee for at least FY 1974 and the first six months of FY 1975 (July 1, 1974 through early January 1975), and ultimately responsible for those duties noted *supra* and for the issuance of status of allotment reports,[6] a function of the accounting office within the Division of Financial Management. Duggar contends that her duties as allottee terminated on January 6, 1975; the defendant disagrees, maintaining plaintiff had this responsibility throughout nine months of FY 1975, until her removal as allottee in April 1975.

In October 1974, Chairman Powell ordered plaintiff, as Director of the Office of Management, to establish a Funds Control Unit within the Division of Financial Services (Management), to be responsible for monitoring the obligation of funds within the dollar ceilings distributed to the various offices. That Unit was to monthly advise the affected offices of their actual obligations vis-a-vis their control figures. Powell instructed plaintiff that "in no case will control figures be exceeded without your approval and that of the Director of the Office of Program Planning and Evaluation."

Fleming, too, wrote plaintiff in October that the absence of any computer printouts since the start of FY 1975 (July 1, 1974) coupled with "our recent experience with the status of obligation reports for FY 1974" prompted concern as to whether "we are getting ourselves into a similar situation in FY 1975." He requested the status of obligation reports for the first quarter of FY 1975, *i.e.*, from July 1 through September 30, 1974, and suggested a way to expedite future reports.

Around this time Commissioner Raymond Telles wrote plaintiff about the problems in financial management and asked that the Chairman have his audit staff investigate the matter.

Buttressed by the sad history of FY 1974, knowledgeable of the extraordinary disarray of vouchers found without order or sequence on floors, on tops of cabinets, and otherwise in and out of boxes, aware of at least some complaints from vendors that EEOC was not timely paying its bills, plaintiff still failed, incomprehensibly, to address her authority and energies to the escalating situation. All she did do was to assure the Commissioners that she had no objection to an audit of the accounting system, stating that

> ... [T]he deficiencies this Office has encountered in producing monthly status reports ... were anticipated and fully explainable.

While plaintiff could not recall when the last "non-garbage" report concerning status of funding was produced, she agreed that the 1974 reports for August and September, at least, were inaccurate, "perhaps not produced," and that the October 1974 report was so inaccurate it was useless.

On November 7, 1974, plaintiff notified Chairman Powell she would be unable to meet her commitment of two days earlier to supply the computer generated runs for the first quarter of FY 1975, attributing that failure to key-punch errors which necessitated manual correction. The first quarter FY 1975 had ended September 30, 1974.

Ms. Duggar was fully aware that Chairman Powell, emphasizing the necessity for timely, accurate financial reports, had appointed a group to review the agency's financial management. Such operations were to commence on November 13, 1974. She had already known since September that an audit of FY 1974 accounts was underway and had discussed the matter then with Richard Huber, Director of the Internal Audit Staff, Office of the Chairman, who conducted the audit from September to March 31, 1975. Huber's task was made all the more difficult since the Section 1311 review should have been, but

---

**6.** A status of allotment report is a monthly report usually issued within ten days after the end of the month giving a statement of all obligations and expenditures of appropriated funds allotted to a federal agency and the amount of funds available for obligation and expenditure.

was not, completed by the time he commenced his audit.

The statute, 31 U.S.C. § 200, mandated that by June 30 each unliquidated (open) obligation was to have been reviewed to assure its continued validity; failure to do so would result in monies returned to the U.S. Treasury. Nonetheless, prior to 1975, the Section 1311 Report had never been prepared even though plaintiff's specific assignments included preparation and issuance of this report, as an on-going activity of her office.

By November 18, 1974, and in a follow-up on November 27, Chairman Powell had been alerted by Huber in "flash reports" (Def. Exs. P, Q) as to improprieties and that "lack of proper procedures and controls at the Office of Management for processing obligations" resulted in exceeding the appropriation limitation by more than $200,-000 in FY 1974. In his initial assessment of the problem, Huber noted further that

> This deficiency in procedures is prevalent throughout the Commission. Financial Management Division is well aware of this condition, however, procedures and controls have not been established to preclude any official or employee of the Commission to authorize or create an obligation in excess of the appropriation limitation imposed by law.

Dismayed at the FY 1974 situation, and recognizing plaintiff's ultimate responsibility for all these concerns as the Director of Management and the agency allottee, Huber outlined the problems: The records (obligating documents) were filed in boxes, not file cabinets, at random and nonsequentially. Open and closed obligations were intermingled. Erroneous corrections on the status of allotment reports, distorting the reality, intensified the crisis. The confusion and error made matters virtually impossible for accurate accounting and responsible financial management. A paid bill, for example, would be posted twice as an obligation: once as a closed obligation, once as an open obligation. Accordingly, the status of allotment reports for FY 1974 as a control of funds were "not worth the paper written

on" since it was impossible to ascertain the amount of funds obligated and there was no knowledge as to how much could be spent and whether the funds were over or under obligated. The situation was, in Huber's words, "A mess!"

Huber urged that plaintiff's Office of Management establish procedures and controls and determine the actual amount of funds overobligated for FY 1974. He recommended further that the Commission "identify the employee(s) responsible for this violation so that appropriate disciplinary action . . . be taken" and to report this information and the fact of violation immediately to the President through the Director of OMB and to the Congress, as required by 31 U.S.C. § 665.

Acting on instructions from Chairman Powell that he was not to reveal any information concerning the audit to anyone other than the Chairman, not even to the Commissioners, Huber disregarded the customary procedures for initial audits. Although there had been a pre-audit meeting with Duggar following notification to her that her office accounts were being audited, plaintiff was precluded comment thereon since she was neither provided a copy of the audit observations/recommendations as they were developed nor a copy of the final draft report. Testifying as plaintiff's witness, Huber nonetheless vividly detailed the chaotic conditions which precipitated his conclusion as to violations of the Anti-Deficiency Act for FY 1974. There is no credible suggestion that Duggar's further input, had she been given the opportunity to comment, would have modified in any way his findings, conclusions and recommendations.

On November 28, Chairman Powell notified Duggar and Acting Executive Director Fleming that, effective December 1, the Office of Management would be subsumed within the Office of the Executive Director. As of that date plaintiff was to report to the Executive Director rather than directly to the Chairman. By December 15, the budget execution function was transferred from plaintiff's Office of Management to the Office of Program Planning and Evaluation.

Two weeks later Huber notified Powell that the Commission had incurred obligations now estimated in an amount approximating $800,000 in excess of the Commission's FY 1974 appropriation. To obtain a reasonably exact and verifiable amount, every transaction applicable to FY 1974, processed from July 1 through December 10, 1974, had to be recomputed and compared to computer listings. Huber allocated several causes of over-obligation: issuance of obligating documents without authority or processing through Financial Management, arbitrary and illegal transfer of obligations from FY 1974 to FY 1975, and key-punch error.

By January 2, 1975, Duggar was advised that a team of accounting specialists would report to EEOC Headquarters four days subsequent to assist in establishing proper procedures and controls within the Financial Management Division, then headed by Clarice Bryce, but under the overall supervision of plaintiff, the Director of the Office of Management.

Plaintiff avers that on January 6, 1975 her responsibility for fiscal matters ended following a meeting with Fleming and others where she met Dennis Worley, chief accountant of the above team, assigned to the Office of the Chairman, as the person who would be taking over the accounting responsibilities of the Commission.

On January 15, Ms. Duggar was directed by Fleming to name one certifying officer to replace a transferee and to consider naming an additional one. She did neither.

Clarice Bryce (black) was reassigned and Dennis Worley (white) succeeded her when he was made Acting Chief, Financial Services Division, Office of Management, on February 7, 1975, with authorization to certify as to the availability of funds for proposed Commission obligations. He had been brought to the EEOC to assist in establishing proper procedures and controls within this Division. He was never made the agency allottee, then or subsequently, as plaintiff had been, but labored to institute an effective system for controlling incurrences of obligations. He, like Huber, found the records in a chaotic state. It was the most serious financial situation he had seen in 23 years' experience. Both posting and payment of bills lagged months untimely; almost all discounts (usually 2%) for prompt payment within ten days were lost during this FY 1974 (it took six—eight months hereafter to place the documents in some order). Space for employees was unavailable, morale low, no funds control unit existed, no certifying officers were working in the financial management area, personnel were poorly trained, Section 1311 validations were non-existent, moving expenses, tax withholding and reporting procedures were absent. When Duggar refused to approve Worley's request for additional personnel to rectify the "horribles" in financial management, even though she was supervisor of both Directors of Financial Management and Personnel, Fleming ordered the Personnel Director to provide these necessary employees. From January to June 1975 Worley and Duggar did not speak; "she ignored me as if I didn't exist . . . . She rebuffed me." While Worley had expected to report to Duggar as "my Chief", following her refusal to assist with personnel and referral of that matter to Fleming, and after consultation with him, Worley thereafter reported directly to Fleming as "my reporting authority" and worked with Helen Steelman, a "colleague", "not in my chain of command" on matters of fund and budget only.

On February 10, Fleming notified Duggar to appoint Worley and another person as certifying officers to guarantee the validity of payments, replacing that authority in Clarice Bryce and Ronald Shaffer. The next day Chairman Powell rescinded Duggar's authority to designate certifying officers.

Duggar does not recall being asked to rescind her allottee status in February, as others so testified, who noted that February request referenced in the April 1975 communication which ordered her removal. Not removed as allottee before April, and admittedly not eliminating herself as such "because I had been appointed by the

Chairman and felt that only the Chairman could remove me", plaintiff contended nonetheless that she "was not the agency's allottee beyond January 6, 1975 [when] my responsibilities as allottee were removed."

It is clear, though, that since mid-February 1975, Duggar, although designated allottee, had been without a substantial part of her former duties and was not, in a practical application, acting with full responsibility for financial management.

Worley, also without such authority, asserting he was merely an "agent" to sign reports, opined that despite Duggar's official designation as allottee and her refusal to yield that status before April 1975, had there been an overobligation for February and March the ultimate burden would have devolved on the Commission's Chairman.

Chairman Powell resigned in early March 1975. Ethel Bent Walsh (white) was named Acting Chairman on March 19, and remained such for only two months, until May 27. Chairman Walsh had been advised in March by Fleming, Worley, and Helen Steelman (then Budget Officer) about the problem state of the Commission's financial records. She took prompt action to request that $2,000,000 of the Commission's apportionment for the last quarter of that fiscal year be apportioned (advanced) for use in the third quarter, ending March 31. OMB, in granting the request, advised Walsh it had "serious concerns" about the Commission's financial management operations and its ability to stay within the fourth quarter FY 1975 funding availability.

Commencing the last week in March, 1975, Walsh affirmatively controlled Commission expenditures: every office was rebudgeted with discontinuance of overtime; a freeze was effected on new hirings and promotions; travel was curtailed unless supported by good justification. She also took action to have herself made agency allottee in April 1975, in place of plaintiff, but was not allottee at the end of FY 1975 at which time she was no longer Acting Chairman.

Establishing a dual track of affirmative response to impending disaster, Worley also brought order to the Commission's actual financial status from February to June 1975. He and his subordinates worked to file accounting documents in sequence so they could be traced and so that purchase orders could be matched with invoices. He procured file cabinets, received the extra personnel sought, commenced operating a Funds Control Unit, and had certifying officers appointed. By May 1975, reliable status of fund reports were issued.

On April 9, Walsh directed plaintiff to take immediate action to prepare for Walsh's signature by the next day a revised EEOC Order No. 445, which was intended to rescind plaintiff's authority as agency allottee.

Several days later, the GAO issued its report on the $800,000 deficiency and other problems previously noted by EEOC auditors. The GAO report confirmed the findings of the Commission auditors regarding FY 1974, expressing its concern as to possible further overobligations for that year which might remain undetected, and which, in turn, might well promote substantial deficiencies for FY 1975. Verifying not only the $800,000 overobligation reported by Huber's internal audit, the GAO found an additional overobligation of $128,961. The total overobligation was now in excess of $900,000.

In the latter part of April, Acting Chairman Walsh gave notice to Duggar that she proposed to remove her from her current position as Director, Office of Management. Duggar responded to the proposed action.

Lowell W. Perry (black) became Chairman, EEOC, on May 28, 1975. Acting promptly, agreeing with Walsh's proposed action and unaccepting of Duggar's explanations, on June 5 he issued a decision removing plaintiff from the position of Director of Management effective June 6, demoting her from a GS-16 to the GS-15 level and reassigning her within the Office of the Executive Director as a Program Analyst.

Chairman Perry's reasons for the demotion and reassignment were stated in his decision letter of June 5, 1975:

a. You failed to develop adequate financial controls for all commitments and expenditures of Commission appropriations which resulted in a deficiency in excess of $900,000 in FY '74.

b. You failed to insure that members of your staff followed prescribed accounting procedures and regulations.

c. You failed to adequately respond and to correct problems in the financial records and control systems which were brought to your attention by the former Chairman, the Acting Executive Director and by members of your staff.

On July 7, plaintiff filed a formal complaint of employment discrimination alleging she was demoted because of discrimination based upon sex, in violation of Title VII of the Civil Rights Act of 1964, as amended.

On July 23, 1975, the Commission's final Internal Audit Report on the FY 1974 matter was issued. This Report covered the close-out of FY 1974 and transactions processed from July 1974 through February 1975 with their related reports. The investigation was "hampered" because the accounting records were not readied for audit and "inordinate efforts were made to reconstruct audit trails to determine the financial conditions of the Commission" when it appeared that at least $800,000 had been overobligated in FY 1974, a violation of the Anti-Deficiency Act. The audit team sent from GAO to verify the reports concurred subsequently (April 6, 1976) in Huber's conclusions as to the status of the records, the fact of overobligation (increasing it by over $100,000) and that the major cause for the violation of the Anti-Deficiency Act in FY 1974 was the ineffectiveness of procedures for controlling obligations.

Plaintiff instituted Civil Action No. 76–1801 in the U.S. District Court for the District of Columbia. Suing the Acting Chairman and Commissioners of the EEOC, former Chairman Powell, and Commissioners of the Civil Service Commission, she alleged generally that her demotion was arbitrary and capricious in that it was predicated upon insubstantial evidence. She averred further that Fleming, the former Acting Executive Director, interfered in her job performance, while not doing the same with male office directors, and that her demotion was predicated upon sex discrimination.

The defendants filed a motion for partial summary judgment on the issue of whether plaintiff's reduction in grade was arbitrary and capricious. On January 9, 1978, Judge Thomas Flannery, to whom the case was assigned, issued judgment for the defendants. The Court adjudged that neither the decision of the EEOC nor its affirmance by the Civil Service Commission was arbitrary nor capricious, and that plaintiff's demotion was based upon substantial evidence, that she had failed to develop adequate financial controls for all EEOC commitments and expenditures in FY 1974, which resulted in a deficiency exceeding $900,000. Lastly, that her demotion was accomplished pursuant to applicable procedures. Only plaintiff's claim of sex discrimination remained, to be tried *de novo*.

On August 7, 1978, plaintiff voluntarily stipulated to the dismissal of her claim of sex discrimination, with prejudice.

While the above matters were proceeding, certain actions pertinent to plaintiff's instant cause were occurring.

Helen Steelman (white), one of the three persons with whom plaintiff compared herself in alleging race discrimination, was employed by the Commission on February 19, 1974, as a budget analyst, GS–14, within the Office of Program Planning and Evaluation. As such, she was responsible for formulation of the Commission's budget, preparing budget schedules and justifications for OMB approval, and preparation of the Commission's budget submission to Congress for appropriation purposes.

In February 1975, the budget execution function, formerly lodged within the Office of Management, was transferred to the Office of Program Planning and Evaluation, under the direction of Steelman, who was named Acting Chief, Budget Division. She

held this position until October 14, 1975. On that date, more than three months following the June 30 close of FY 1975, Steelman was named Acting Director, Office of Financial Management, a position she retained until October 1977. Accordingly, from a financial management perspective within the organizational structure, after October 14, 1975, Steelman was in a position somewhat comparable to plaintiff. Nonetheless, she was not then, nor subsequently, made agency allottee as plaintiff had been.

While Steelman was Acting Director, the Commission's auditors, based upon the GAO recommendation, in January 1977 commenced a review of the FY 1975 financial records. Shortly thereafter, the Internal Audit Unit submitted a preliminary draft audit report to Steelman which concluded there was an apparent overobligation of $133,000 in Commission funds as of September 30, 1976, for FY 1975, and an overobligation of $113,000 as of June 30, 1975. On two occasions Steelman submitted comments disagreeing with the audit findings.

The May 1977 report of the Internal Audit Unit relevant to the FY 1975 reiterated, in final form, its preliminary conclusions. Again Steelman contested the matter and submitted comments.

The unresolved disagreement between the auditors and Steelman was scheduled for Commission consideration during the time Ethel Bent Walsh was once again Acting Chairman, May 15, 1976 to June 5, 1977. While pending this matter, following the June 1977 appointment of Eleanor Holmes Norton (black) as Chairman of the EEOC, Huber, Chief of the Internal Audit Unit, indicated that a supplemental appropriation was not, as had been earlier requested, now required in light of reevaluation and reduction of the amount of the possible overobligation.

The joint statement of Huber and Steelman solicited an opinion from the Office of General Counsel regarding an apparent technical violation of the Anti-Deficiency Act.

Concluding that the records were in such poor state to preclude knowledge that an overobligation occurred as of June 30, 1975, or September 30, 1976, the General Counsel advised that the Commission was not required to report an anti-deficiency violation to Congress.

The auditors and FSD have agreed, and we concur, that the Commission does not "know" that a violation had occurred. And further, it cannot even be reasonably surmised that a violation has occurred. Therefore, in our opinion, a report on a violation of the Anti-Deficiency Act is not required, and would be premature at this time.

Preston David, Executive Director of the EEOC in June, 1977 and principal manager of the incoming Norton administration, arriving in the midst of this controversy, determined that Helen Steelman was neither the agency allottee nor the responsible party in FY 1975; she was merely the person in charge of the Financial Management Office who provided information during the 1977 audit. He further concluded that Yvette Duggar had been the allottee for nine months of FY 1975 (July 1, 1974—April 1975) and was the agency official responsible for that year's financial activities. Mr. David's testimony was fortified by his findings, resulting from intense investigation of the overall situation upon his arrival at EEOC, the subsequent circumstances and his own experience as agency allottee.

Agreeing with the General Counsel's determinations and its own assessment of the matter, the Commission neither reported any Anti-Deficiency Act violation for FY 1975 nor took disciplinary action against anyone for the matters reported in the May 1977 Internal Audit Report for FY 1975.

Relitigation of those issues already determined in plaintiff's first Title VII case, founded on sex discrimination, was precluded pretrial in this second Title VII action, based on racial discrimination; nonetheless, plaintiff has been afforded a full opportunity to pursue her complaint of racial discrimination and her allegations of selective enforcement and disparate treatment.

Title VII of the Civil Rights Act of 1964 prohibits the discriminatory treatment of any employee because of "such individual's race", Section 703(a)(1), 42 U.S.C. § 2000e–2(a)(1).[7]

Supporting the foundation of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its fertile progeny [8] in continuing "to elaborate and refine the substantive nature of the Title VII intentional discrimination claim and its means of proof by indirect or circumstantial evidence", *Lovelace v. Sherwin-Williams Co.,* 681 F.2d 230, 238 (4th Cir. 1982), the Supreme Court recently restated the allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

The plaintiff must first succeed in proving, by a preponderance of the evidence, the essentially simple but mandatory prima facie case, which creates the rebuttable presumption of unlawful discrimination.

■ Those elements of a prima facie case of racial discrimination require a plaintiff to show:

(i) that he belongs to a racial minority;

(ii) that he applied and was qualified for a job for which the employer was seeking applicants;

(iii) that, despite his qualifications, he was rejected; and

(iv) that after his rejection the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 253 n. 6, 101 S.Ct. at 1094 n. 6, quoting *McDonnell Douglas.*

Acknowledging these criteria must flex to particularized situations, as here, the Court has noted that *McDonnell Douglas'* elements for a prima facie case demonstrate a model only, "not necessarily applicable in every respect for differing factual situations." *Id.,* at 802 n. 13, 93 S.Ct. at 1824 n. 13; *Burdine,* 450 U.S. at 253–54 n. 6, 101 S.Ct. at 1094 n. 6. The phrasing of the elements to fit the adaptations instantly presented are rapidly expressed: plaintiff may establish a prima facie case by evidence that she was a member of the protected class; was disciplined, demoted and singled out for adverse treatment, or, in any event, treated adversely in her employment while others similarly situated, but not of the protected class, were dissimilarly treated. *See, McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976); *Long v. Ford Motor Co.,* 496 F.2d 500 (1974).

Clearly, Ms. Duggar, black, is a member of the protected class. She was disciplined in the sense that numerous responsibilities originally lodged with her in her dual capacities as Director of Office of Management and agency allottee were withdrawn commencing January 1975 and continuing into April 1975. As example, Dennis Worley, while never allottee, nonetheless assumed financial management duties, becoming Acting Chief of the Office of Financial Management in mid-February 1975, under Duggar's overall supervision. In that same month certain budget functions were removed from plaintiff's control and placed under Helen Steelman who, although never allottee of EEOC, became Budget Officer. Acting Chairman Walsh rescinded plaintiff's authority as agency allottee in April 1975, which authority thereafter vested in that Chairman for approximately two

---

**7.** Section 703 of the Act, 42 U.S.C. § 2000e–2, provides in pertinent part:

"(a) Employer practices. It shall be an unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

**8.** Foremost, among others, *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977).

months. Plaintiff was demoted to a GS–15 and a different position on June 5, 1975.

In *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 the Supreme Court stated:

> "Disparate treatment" ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex or national origin. Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment. [Citation omitted.] Undoubtedly disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII ....

Not every wrong has a remedy and so, it is not unlawful to treat persons unfairly, if all persons are treated similarly.

Plaintiff contends she was singled out for adverse treatment and treated worse than others of similar situation, not of the protected class. Worley, Steelman and Walsh, white, are not of the protected class.

In increasing degree, duties were removed from Duggar and subsequently she was demoted. While neither Worley nor Steelman were similarly "disciplined", nor demoted, and while both Worley and Steelman had extensive financial/fiscal responsibilities during a portion of the relevant time period, they cannot be considered "similarly situated" to plaintiff. Neither was ever agency allottee; neither bore final financial responsibility at EEOC, as plaintiff did, during the same, almost disastrous period of crisis. While facially it appears inequitable that Steelman could comment at various levels about the on-going audit for FY 1975, and plaintiff was precluded from doing so for FY 1974, these two persons were in dissimilar situations with different responsibilities.

Plaintiff was Director of Management at time of audit comment for FY 1974; from a financial management perspective, Steel-

man was for the first time in a position comparable to plaintiff three months *after* the close of FY 1975 when she became Acting Director, Office of Financial Management, a position still held in 1977 when the auditors reviewed the agency's FY 1975 financial records and when it was determined that no Anti-Deficiency Act violation would be reported to Congress for FY 1975.

For two months of FY 1975 (April—June) Walsh, in a similar position to plaintiff for that fraction of FY 1975, assumed plaintiff's status and responsibilities as agency allottee.

While plaintiff has not carried her burden of a prima facie case as to Worley or Steelman,[9] a thready prima facie case may then be said to have been made out to one white person, Walsh, who, with similar duties, was treated dissimilarly. Walsh, a Presidential appointee, was neither demoted or removed.

Having detailed the corresponding proof process for proving a disparate treatment claim of intentional race discrimination under Title VII, we transpose to our case the substantive elements of the claim:

(a) That an employee, Ms. Duggar, of the protected class (b) has suffered an unfavorable employment action by an employer (c) under circumstances in which the employee's race was a determining factor in the sense that "but for" the discriminatory motive because of her race, she would not have suffered the action.

■ With the establishment of a prima facie case, the burden shifts to the employer "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate discriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. *Board of Trustees v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 296, 58 L.Ed.2d 216 (1978). It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated

---

**9.** If we were to accept plaintiff's premise that Worley or Steelman were in similar situation to plaintiff, yet treated more favorably, the de-

fendants' response vigorously rebuts any presumption which could be raised by such prima facie case.

against the plaintiff." [10] The burden imposed on the employer is not "to introduce evidence, which, in the absence of any pretext, would persuade the trier of fact that the employment action was lawful", but only to "articulate lawful reasons for the action." [11]

■ Here, the defendant has rebutted the presumption of discrimination by clear, credible articulation of the reasons for its actions both in disciplining and subsequently demoting Ms. Duggar. The production of evidence has been emphatic and overwhelming.

In sum, disciplinary measures translated into reduction/removal of plaintiff's duties. Several times she was directed by the Chairman to establish a Fund Control Unit to develop and maintain adequate financial controls for all commitments and expenditures of Commission appropriations. She did not do this. One of Ms. Duggar's essential responsibilities was to provide monthly status of allotment reports. She provided none for some periods and admittedly inaccurate ones for other times. The Section 1311 validation report was due annually. It had never been prepared until Worley did it in 1975. Plaintiff was told to cooperate with Worley. She did not, refusing to assign needed personnel to him, refusing him other cooperation, including communication. Plaintiff was directed to appoint certifying officers; she did not do so. The crisis escalated daily, virtually beyond control, in the chaotic environment of EEOC's Financial Management Office: morale down, no Funds Control Unit, no certifying officers working in the financial management area, insufficient files and file cabinets, poorly trained personnel, months' delay in posting of documents, months' delay in payment of vendors and lag in payment of Commission employees, haphazardly filed vouchers, no matching of purchase orders and invoices.

Ms. Duggar as Director of the Office of Management, and as allottee, bore ultimate responsibility to perform her duties, to rec-ognize mounting difficulties, to supervise appropriately, to follow clear directives and to defuse potentially explosive areas. But instead, she did little or nothing when alerted to impending danger and, indeed, refused to affirmatively respond to directives of the Commission Chairmen, the Acting Executive Director, similarly ignoring the warnings of her staff.

As a result of her derelictions her prior duties were first limited, and later eliminated. She was directed by EEOC's Chairman to remove herself as allottee in February 1975. She refused to do so. In April 1975 she was stripped of this ·status.

The final audit reported a violation of the Anti-Deficiency Act for FY 1974 based on an overobligation of funds appropriated to the EEOC. Even Duggar concedes her responsibility for the financial management of the EEOC during this period of time.

We must be mindful that as early as September 1974 an intensive audit was underway arising from a sense of lurking financial difficulties under Duggar's supervision and ripening concern that even more massive ones were to surface shortly. In November, Huber was "flashing" reports to the Chairman, alerting him to imminent crisis in this area. It was the Chief Auditor who already then clamored for immediate corrective action and identification and "appropriate discipline" of the employee responsible for the past and impending disasters.

The 1974 audit expressed concern as to possible undetected further overobligations for that year which, in turn, could trigger similar crises in FY 1975.

The audit for FY 1975 reported a violation of the Anti-Deficiency Act based on an overobligation of funds appropriated to the EEOC for FY 1975. It was subsequently determined that the "violation" might not, on reflection, be an actual violation. Plaintiff admits responsibility for financial management of the EEOC during the first half of FY 1975.

---

10. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248 at 254, 101 S.Ct. at 1094.

11. *Id.,* 450 U.S. at 257, 101 S.Ct. at 1095.

While the evidence demonstrated steadily decreasing duties after this time, Ms. Duggar still retained functional responsibility for many activities well into the third quarter FY 1975. It was she who refused to abandon the allottee status in February, as requested, admitting that she could only be removed by the Chairman, an act that occurred in April 1975. She must bear the burden of her functional responsibility at the very least, even if excused for the period of titular status (approximately mid or end February) to April.

Reports from EEOC's internal auditors, verified by GAO auditors, make manifestly clear that the problems of FY 1975, considerably less onerous than in FY 1974, were in largest part the spillover, aggravating result of the deplorable financial management existent in FY 1974.

While plaintiff should have been given formal opportunity to comment on the FY 1974 report, and was not, plaintiff's own witness (the auditor Huber) and the defendant's evidence made vividly clear that her comments would have not altered in any respect the findings and recommendations concerning the bizarre happenings of FY 1974.

These factors then leading to the demise of duties also led, inevitably, and as a reasonable employer's response, to plaintiff's demotion. Her deficiencies of performance, through omissions and violations, casually dismissed by her but found flagrant by her employer, could well comprise the legitimate, non-discriminating grounds for both discipline and demotion.

When the employer has met its burden of articulating, by admissible and credible evidence, a lawful reason for its act, "the presumption raised by the prima facie case is rebutted." [12]

It can be readily observed here that the presumption raised by the prima facie case has been overwhelmingly rebutted by the defendant.

Plaintiff has not demonstrated, as she must to prevail, " ... that the proffered reason was not the true reason for the employment decision," [13] that is, was a pretext for the discriminatory reasons for demotion. Here, the burden of persuasion rests on the plaintiff who, however, is not required to introduce new evidence. [14] Plaintiff has not met her burden.

It is obvious that given repeated opportunities to respond to the unfavorable situation, despite requests and then demands that she comply with directives, confronted with her shortcomings and inability to handle the system, plaintiff continued to ignore known problems, blinking at reality as the deficiencies magnified, offering excuses, attributing blame to others and never acknowledging the fault as hers.

It is regretful that plaintiff, with her recognized competence (which hoisted her to the position in the first instance) simply did not do the job as mandated. The crisis generated as a result of this failure demanded her best efforts to remedy the awesome developments. She did not apply her efforts and consequently failed to rectify the situation. The employer had to take rapid and rigorous measures to avoid even more calamitous outcome. As a consequence the discipline exercised toward plaintiff by the EEOC and her subsequent demotion are within a sound expression of employment decision with business reason justification. *Ste. Marie v. Eastern R.R. Ass'n,* 650 F.2d 395 (2nd Cir.1981).

There is not the slightest suggestion here of racial overtone or animosity. There is simply no evidence to indicate that the employer's motivation was, even in some part, racial. Neither demonstrating selective enforcement nor disparate treatment nor any dissimilar treatment in employment, Ms. Duggar's claim of discrimination based on race is wholly lacking in merit and demands judgment for defendant.

---

12. *Id.,* 450 U.S. at 256, 101 S.Ct. at 1095.

13. *Id.,* 450 U.S. at 256, 101 S.Ct. at 1095.

14. *Id.,* 450 U.S. at 256 n. 10, 101 S.Ct. at 1095 n. 10.

A separate Judgment reflecting this decision accompanies this Memorandum Opinion.

## JUDGMENT

In consideration of the Memorandum Opinion of this date, the 29th day of October, 1982,

Judgment be and it hereby is granted in favor of defendant, Clarence Thomas, Chairman, Equal Employment Opportunity Commission, and against the plaintiff, Yvette W. Duggar.