GLICKSTEIN, Judge.
This is an appeal by the defendant city, city manager and chief of police from awards, following jury trial, of compensatory damages against all defendants of $500,-000 and punitive damages against the individuals of $25,000 and $15,000 respectively. The verdict is appended. We affirm.
The cause of action arose out of reverse racial discrimination involving the discharge of the white plaintiff by blacks from his employment as a law enforcement officer. We conclude the plaintiff established his cause of action and a basis for punitive as well as compensatory damages. Because of changes in the law of damages pronounced by the United States Supreme Court while this appeal was pending, had the defendants objected to the jury instruction, we would have remanded for retrial on the amount of compensatory and punitive damages. Had the city objected to the instruction, award for the “value” of plaintiff’s constitutional rights could only have been nominal albeit we conclude the award here was more than nominal.
The record reflects the following facts:
1. On June 1, 1983, appellee, who is white, along with four other Riviera Beach police officers, participated in the investigation of a theater robbery. This eventually led to the stop of an automobile which was occupied by the robbery suspect and which was driven by Derrick McCray. The actual details of the stop are unclear, but apparently a number of racial slurs were shouted by one or both sides. Appellee frisked McCray during the stop. During the frisk, appellee had his gun in his hand.
During the stop, McCray was visibly upset. At some point, McCray claimed that appellee put his gun to McCray’s head and said “you better be quiet before I put this .38 through your skull.” McCray admitted he never saw the gun pointed at his head; and appellee testified that he never pointed his gun at McCray’s head or made the threat.
*859 Later that night, Derrick McCray appeared at the police station accompanied by his parents Herman and Lillian McCray and brother Herman, Jr. Herman McCray, a political power in Riviera Beach at that time, was extremely upset. That same evening Herman McCray and his wife wrote a letter complaining of the incident to the City Manager, appellant Wilkins, with copies to the Chief of Police, appellant Darden, the Chairman of the City Council, and two members of the Civil Service Board.
2. On June 2, 1983, appellee appeared before appellant Darden, the Chief of Police, to explain his conduct on the preceding night.
3. At a city council meeting, Derrick McCray and his father, Herman, appeared before the city council to complain of the June 1 incident. At that meeting, a motion was made by one council member and seconded by another to remove Wilkins from office. One of the major concerns of the people seeking to remove Wilkins was that he was not handling the racial situation in the police department properly. However, Wilkins was not fired because the third council member at the meeting left the meeting and destroyed the quorum.
4. The early summer of 1983 was a period of extreme racial tension in the City of Riviera Beach. The city government had undergone a transition in which the City Council had gone from predominantly white to predominantly black. However, the police department was still predominantly white. It was commonplace for blacks to make allegations of police brutality on the part of white officers. During the same period of time, an incident occurred in Riviera Beach in which a white policeman was accused of using too much force, and which almost caused a riot involving approximately one hundred people.
5. In that summer, after an internal investigation of the June 1 incident, each of the white officers involved in the incident was disciplined. Officers Parker and Migl-iore were reprimanded, Officer Dick was suspended for thirty days, and appellee was fired. Officer Davis, the only black officer involved, received a commendation. Officer Davis testified at trial that this was a “good felony stop” and felt the other officers should have been commended as well. Termination of appellee’s employment was based upon the June 1 incident. A letter to him said that he was entitled to a disciplinary review board hearing before the termination would become effective.
6. On July 12, 1983, appellee requested a disciplinary review board hearing.
7. On July 13, 1983, appellant Wilkins notified appellee that his employment had been terminated. As grounds for termination, the notice specified the June 1 incident.
8. Appellee filed a grievance in mid-July regarding his discharge, pursuant to the collective bargaining agreement between the Fraternal Order of Police and the City of Riviera Beach. Appellant Wilkins never responded to this grievance form.
9. On July 26, 1983, appellant Wilkins rescinded appellee’s termination and awarded appellee back pay. At that time, appellant Wilkins notified appellee that appellee would be suspended with pay until the matter was resolved.
10. On July 28, 1983, appellee was notified that the disciplinary review board hearing would be held the following day.
11. On July 29, 1983, the disciplinary review board hearing was held. Officer Pfefferkom, one of the review panel members, testified that the hearing was conducted improperly.
12. On August 2, 1983, the disciplinary review board recommended that no action be taken against appellee.
13. On August 24, 1983, appellant Wilkins notified appellee that his employment was terminated. As grounds, the letter specified not only the June 1 incident, but also a 1982 shooting incident; a 1983 neglect of duty incident; and the substandard evaluation which appellee had received in his most recent six months review.
14. On August 30, 1983, appellee notified the Civil Service Board that he was appealing the termination. The board *860 hearing was required to be held within 30 days of notice of appeal.
15. On September 28, 1983, appellee was notified of the Civil Service Board hearing to be held on October 1, 1983.
16. On September 30, 1983, appellee was notified that the Civil Service Board hearing had been rescheduled for October 4, 1983.
17. On October 4, 1983, appellee appeared for the above hearing, but the hearing was postponed. Appellee waited for approximately six hours that evening for the hearing to begin.
18. On October 19, 1983, appellee filed this action.
There is testimony that appellant Darden “ran” the disciplinary review board hearing. Previous review board hearing panels had been permitted to interview witnesses or at least have their statements presented in a “package” prior to the hearing. However, in appellee’s review board hearing, statements were presented to the panel in a piecemeal fashion and only after the panel requested them several times. Likewise, the grievance form provided under the rules was ineffective. Appellee filed a grievance form, but appellant Wilkins failed to respond as required.
We concur with Southern Alliance Corporation v. City of Winter Haven, 505 So.2d 489 (Fla. 2d DCA 1987), and hold that the trial court had subject matter jurisdiction over the civil rights action under 42 U.S.C. § 1983 against the city. While we shall not mention all of the issues, we reject appellants’ contentions that (a) Parratt v. Taylor, 451 U.S. 527, 101 5.Ct. 1908, 68 L.Ed.2d 420 (1981), precludes the present action, (b) County of Monroe, Florida v. U.S. Dept. of Labor, 690 F.2d 1359 (11th Cir.1982), precludes appellee’s recovery of back pay under the present facts and circumstances. We also reject the contention that the evidence was insufficient to establish intentional racial discrimination. See Nix v. WLCY Radio, 738 F.2d 1181 (11th Cir.1984). Furthermore, we reject the contention that the evidence was insufficient to establish “but for” his race — white—appellee would not have been terminated. See McDonald v. Sante Fe Trail Transportation Company, 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
Memphis Community School District v. Stachura, 477 U.S. 299, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986) was decided one month after the trial of this cause, albeit argued one month before the trial. In a case similar in many respects to the present one, City of Riviera Beach v. Fitzgerald, 492 So.2d 1382 (Fla. 4th DCA 1986) —this court quoted the following from footnote 13 of the majority opinion in Memphis:
We therefore hold only that damages based on the “value” or “importance” of constitutional rights are not authorized by § 1983, because they are not truly compensatory.
477 U.S. at 309, 106 S.Ct. at 2544, 91 L.Ed.2d at 260.
The opinion by this court in Fitzgerald did not expressly recite that there was an objection by the defendant to the jury instruction; however, the parties’ briefs reveal that the instruction given — over objection by defense counsel — concluded with:
Specifying such damages will always be difficult, but they must at least be an amount which will insure the victim that personal rights will not be slightly regarded by state officials or federal courts.
This is a critical distinction between the Fitzgerald case and the present one. Fitzgerald is therefore clearly distinguishable because of the absence of objection here to the instruction. Had there been no objection to the instruction in Fitzgerald, the award of $125,000 could not have been reversed absent a finding of fundamental error.
There is great similarity between the instruction given here and that given in Memphis. The jury here was told:
If you find that Steven J. Langevin has been deprived of a constitutional right you may award damages to compensate for the deprivation. Damages for this type of injury are more difficult to mea *861 sure than damages for a physical injury or injury to one’s property.
The precise value you place upon any constitutional right which you find was denied to Steven J. Langevin is within your discretion. Specifying such damages will always be difficult, but they must at least be an amount which will assure the victim that personal rights will not be lightly regarded by governmental officials.
In Memphis the jury was told:
“If you find that the Plaintiff has been deprived of a Constitutional right, you may award damages to compensate him for the deprivation. Damages for this type of injury are more difficult to measure than damages for a physical injury or injury to one’s property. There are no medical bills or other expenses by which you can judge how much compensation is appropriate. In one sense, no monetary value we place upon Constitutional rights can measure their importance in our society or compensate a citizen adequately for their deprivation. However, just because these rights are not capable of precise evaluation does not mean that an appropriate monetary amount should not be awarded.
The precise value you place upon any Constitutional right which you find was denied to Plaintiff is within your discretion. You may wish to consider the importance of the right in our system of government, the role which this right has played in the history of our republic, [and] the significance of the right in the context of the activities which the Plaintiff was engaged in at the time of the violation of the right.
However, there is a critical distinction between this case and Memphis — which we hold to be controlling here. Footnote 6 of Memphis said:
Respondent argues that petitioners did not preserve their challenge to the jury instructions below. Petitioners’ counsel expressly objected to the authorization of damages based on the value of constitutional rights, on the ground that such damages were impermissible under Carey v. Piphus, supra, [435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252], and on the ground that they required the jury to “speculate as to what the value of the Constitutional right is.” The District Court responded by stating that it relied on Herrera v. Valentine, supra, [653 F.2d 1220] at 1227 [CA8 1981], and on Corriz v. Naranjo, 667 F.2d 892 (CA10), cert. dism’d, 458 U.S. 1123, 103 S.Ct. 5, 73 L.Ed.2d 1394, (1982). Both of those cases held that jury instructions similar to those used here were permissible under Carey. This exchange satisfies us that counsel for petitioners “stat[ed] distinctly the matter to which he objected] and the grounds of his objection,” Fed. Rule of Civ.Proc. 51, and that the District Court understood the objection.
Id. at 304 n. 6, 106 S.Ct. at 2542 n. 6, 91 L.Ed.2d at 257 n. 6. No such objection was made by the defendants in this case; and we reject the contention of the defendant, Wilkins, that the giving of the instruction was fundamental error.
There is no question in our minds that the jury made a substantial award for the “value” of constitutional rights, notwithstanding the appended jury verdict form which, unlike that in Fitzgerald, did not have a specific place for the jurors to write in a figure for this element of the plaintiff’s damages.
On closing argument, plaintiff’s counsel suggested the following:
I suggest that that total is going to come out to somewhere at least in the neighborhood of $100,000, for the out-of-pocket losses. You then consider the testimony that you have heard about what he has been through for the past three years as a consequence of the wrongful conduct to which he’s been subjected. The humiliation of opening that newspaper in the morning and seeing his name plastered all over the headlines.
And again, I’m not going to spend much time on that number with you either. I suggest that for those past three years in appropriate figure is at least $75,000. $25,000 a year for the last three years for what he has been forced *862 to endure, through the intentional gross misconduct of the Defendants who don’t care enough about this case to even be here today.
[[Image here]]
I suggest that with regard to the punitive damage awards against Mr. Wilkins and Mr. Darden that you return punitive damage verdicts of $5,000 each, as a minimum....
Let’s talk finally about the value of those constitutional rights and consider if you would just these final comments from me.
We live now in an age of increasing impersonalization. A lot of the decisions that impinge upon our lives are made by some Government functionary some place who is feeding information into some computer which feeds information into some other computer someplace else.
And there are very few protections that we have against that impersonalization of modem society. None of those protections is more important than our constitutional rights guaranteed to us under the Bill of Rights and protected through a jury trial system just like this. There are twelve or thirteen seats in that jury box, and the reason that there are that number of seats is that in this state, in capital cases, those cases where someone may lose their lives as a consequence of the commission of a crime, there is a jury of twelve persons impaneled and room for an alternate.
Yet I tell you, although there have been lawsuits tried in this very courtroom before jurors sitting in those very seats upon whom the responsibility was placed to make life and death decisions, no juror who has ever sat in those seats has been faced with a more significant responsibility than the responsibility that you have. Because it is your responsibility to protect life and liberty. Just as it was their responsibility to protect life and liberty, it is yours. And there is no more important case that has ever been tried in this courtroom than this one.
How do you place a value on those rights? How do you place a value on those safeguards? You have got to think in historic terms. You have got to think about what happens when the safeguards are removed. You have got to think about the deprivation of due process and equal protection, to which citizens of the German Republic were subjected, and the consequences of those deprivations of basic rights.
And you have got to recognize that we don’t lose our rights in one fell swoop. We lose them little pieces at a time. And we don’t protect against the losses in most circumstances through fighting major wars, but by fighting smaller battles, like the battle that’s been going on in this courtroom.
That is the magnitude of the responsibility that you have, and your verdict must, must, must reflect the value of the constitutional rights that we’ve been discussing.
I’ve devoted my life to the law in choosing the profession that I chose. The law has played a different role in each of your lives. You are obliged to call upon that past experience, whether it’s personal experience or whether it’s experience of having read about the deprivation of rights in history books, or heard about it in civics classes, and you have got to say to yourself, what is this right worth? And when perceived in those terms, I suggest to you that the only figure that can go on the at line has got to be a figure of at least one million dollars. Because we’re talking about precious, precious values.
On rebuttal, plaintiff’s counsel emphasized again the $1,000,000 suggested verdict for violation.
The majority opinion in Memphis said: History and tradition do not afford any sound guidance concerning the precise value that juries should place on constitutional protections. Accordingly, were such damages available, juries would be free to award arbitrary amounts without any evidentiary basis, or to use their unbounded discretion to punish unpopular defendants. Cf. Gertz [v. Robert Welch, Inc.] 418 U.S., [323] at 350, 41 *863 L.Ed.2d 789, 94 S.Ct. 2997 [at 3012]. Such damages would be too uncertain to be of any great value to plaintiffs, and would inject caprice into determinations of damages in § 1983 cases. We therefore hold that damages based on the abstract “value” or “importance” of constitutional rights are not a permissible element of compensatory damages in such cases.
Id. at 310, 106 S.Ct. at 2645, 91 L.Ed.2d at 261. The court also said in footnote 11:
We did approve an award of nominal damages for the deprivation of due process in Carey. 436 U.S., at 266, 98 S.Ct. 1042 [at 1063], 66 L.Ed.2d 252.
Id. at 308, 106 S.Ct. at 2544, 91 L.Ed.2d at 260. We were consistent with this when we held in Muroff v. Dill, 386 So.2d 1281, 1283 (Fla. 4th DCA 1980), that proof of liability afforded a right to nominal damages, albeit evidence was lacking respecting the correct measure of damages.
Justice Marshall, with whom Justices Brennan, Blackmun and Stevens joined, wrote in Memphis:
I agree with the Court that this case must be remanded for a new trial on damages. Certain portions of the Court’s opinion, however, can be read to suggest that damages in § 1983 cases are necessarily limited to “out-of-pocket loss,” “other monetary harms,” and “such injuries as ‘impairment of reputation ..., personal humiliation, and mental anguish and suffering.’” See ante, at 299, [106 S.Ct. at 2543] 91 L.Ed.2d 258. I do not understand the Court so to hold, and I write separately to emphasize that the violation of a constitutional right, in proper cases, may itself constitute a compensable injury.
[[Image here]]
The instructions given the jury in this case were improper because they did not require the jury to focus on the loss actually sustained by respondent. Rather, they invited the jury to base its award on speculation about “the importance of the right in our system of government” and “the role which this right has played in the history of our republic,” guided only by the admonition that “[i]n one sense, no monetary value we place on Constitutional rights can measure their importance in our society or compensate a citizen adequately for their deprivation.” These instructions invited the jury to speculate on matters wholly detached from the real injury occasioned respondent by the deprivation of the right. Further, the instructions might have led the jury to grant respondent damages based on the “abstract value” of the right to procedural due process — a course directly barred by our decision in Carey.
The Court therefore properly remands for a new trial on damages. I do not understand the Court, however, to hold that deprivations of constitutional rights can never themselves constitute compen-sable injuries. Such a rule would be inconsistent with the logic of Carey, and would defeat the purpose of § 1983 by denying compensation for genuine injuries caused by the deprivation of constitutional rights.
477 U.S. at 313-316,106 S.Ct. at 2546-8, 91 L.Ed.2d at 263-4. The instruction here surely invited the jury to do what the Memphis jury was invited to do.
There is ample evidence of damages other than those sought for the “value” of constitutional rights, including, as to the convoluted proceedings leading ultimately to appellee’s dismissal from the police force, the stress of that period and appel-lee’s unsuccessful efforts to find a job with another police department in Palm Beach County. After occupying a position as a police officer for several years, appellee suddenly found himself being decertified by the State of Florida, which barred him from his chosen profession. At that point, appellee was forced to go through the process of challenging the decertification. Ultimately he succeeded in retaining certification.
Appellee was subjected to receiving rejection letters from police organizations. When he turned to other areas of employment, his efforts were hampered by the *864 fact that his face and name were constantly in the media in relation to this case. Finally, he obtained a job as a desk clerk in a hotel at a lower rate of pay. He also presented documented evidence at trial as to his past and present income, his inability to make car payments or charge card payments, and his being compelled to move out of his own apartment and back into his parents’ home.
The above facts are reminiscent of those recited in the lower appellate court’s decision in Stachura v. Truszkowski, 763 F.2d 211 (6th Cir.1985), which became the Memphis case when reviewed by the supreme court. Parenthetically, the Sixth Circuit also rejected, as we have done, the Parratt defense raised here on the issue of liability.
DELL and GUNTHER, JJ., concur.
*865 APPENDIX
[[Image here]]